**JAY DEE CONTRACTORS,
INC., Plaintiff,**

v.

**TEWS COMPANY, INC., f/k/a Tews
Lime & Cement Co., Defendant.**

Civ. A. No. 89-C-651.

United States District Court,
E.D. Wisconsin.

March 13, 1992.

Abba I. Friedman, Butzel Long Gust Klein & Van Zile, Birmingham, Mich., and Michael Ash, Godfrey & Kahn, Milwaukee, Wis., for plaintiff.

J. Ric Gass, Kravit Gass & Weber, Milwaukee, Wis., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

REYNOLDS, Senior District Judge.

### FINDINGS OF FACT

The plaintiff, Jay Dee Contractors, Inc. ("Jay Dee"), is a construction firm from Livonia, Michigan. Jay Dee was founded in 1965 and is known for its work in building tunnels and underground structures for municipalities primarily in the Midwest. Jay Dee is an expert in tunneling and in the capabilities of tunnel boring machines ("TBM"). Jay Dee uses concrete in various construction applications but is not an expert in the development of concrete mix designs. Jay Dee has been involved with a number of projects for the Milwaukee Metropolitan Sewerage District ("MMSD"). Glen Rorison ("Rorison") is the vice president and project/construction manager of Jay Dee. James Kabat ("Kabat") was a project engineer for Jay Dee.

The defendant, Tews Company, Inc. ("Tews"), entered the ready-mix concrete business in the 1930s and is the largest concrete supplier in Wisconsin. Tews operates several concrete mixing stations in the Milwaukee area, from which it supplies local contractors. Tews is an expert in creating concrete mixes and in concrete testing techniques. Jay Dee and Tews had a business relationship since 1983. Dick Pierce ("Pierce") is Tews' chief engineer and is in charge of quality control. David Justin ("Justin") is a quality control engineer and lab manager for Tews.

Pursuant to a MMSD contract which Jay Dee was awarded in 1987, Jay Dee was engaged in digging a sewer tunnel and its connecting structures ("the tunnel project") near downtown Milwaukee. Jay Dee purchased all the ready-mix concrete for the tunnel project from Tews.

The procedure at issue in this action was unique in that it had never been attempted before. Jay Dee planned to pour six vertical columns of "weak" concrete around a corrugated metal tube sitting on a base of a block of weak concrete, which is referred to as a concrete plug. This procedure would create manholes, which would intersect the horizontal sewer tunnel. Jay Dee would then drill horizontally under the first two manholes and then through the remaining four manholes with a soft-rock TBM, thus connecting the manholes with the horizontal tunnel. This procedure was not included in the original bid from Jay Dee to MMSD.

Because Jay Dee anticipated moist and unstable soil conditions through which the TBM would proceed, Jay Dee was concerned that the ground might collapse into the tunnel while it made the connections between the drop manholes and the tunnel. Jay Dee thought some kind of "weak" concrete might prevent the excavations from collapsing yet be weak enough for the TBM to bore through. Jay Dee concluded that it needed weak concrete with a strength in the range of 600 to 800 pounds per square inch ("psi"), not to exceed 1000 psi. Jay Dee knew that there were additives available to retard or accelerate concrete strength.

In the construction business, there usually is a concern that concrete will not be strong enough; there rarely is a concern that concrete will become too strong. "Weak" concrete is normally used as a fill material or for temporary construction. There is a distinction between such weak concrete and concrete which is used for permanent, structural purposes.

Jay Dee and Tews had two meetings concerning the weak concrete for the manholes and the plugs. During the first meeting, which took place on or around March 18, 1987, Rorison and Kabat explained the general nature of the tunnel project and the manhole procedure to Pierce and Justin. Rorison and Kabat explained that they wanted a concrete mix with a strength of 600 to 800 psi, and that the mix should not exceed 1000 psi because the TBM may not have been able to bore through greater strengths.

The second meeting between Jay Dee and Tews, which took place approximately two weeks after the first meeting, was conducted at Tews' lab to demonstrate that Tews had the expertise to produce quality concrete of 600–800 psi, because Jay Dee was concerned with the unique requirements of the manhole concrete. No substantive discussions took place which differed from the first meeting.

In the spring of 1987, Tews created three sample concrete mixtures that met Jay Dee's psi specifications at 28 days and gave them to Jay Dee to evaluate. All three mixes had identical amounts of cement but varying amounts of fly ash. Tews knew that concrete strength increases with time and that fly ash will increase concrete's strength gain. Jay Dee performed some crude tests on the samples and decided to order the sample with the middle psi level of 605. This mix can be characterized as "unusual" in terms of the proportions of additives.

There was no written agreement between Jay Dee and Tews concerning the purchase of the weak concrete. There never was a discussion between Jay Dee and Tews regarding: (1) the strength the concrete should or would reach after 28 days; (2) ASTM C94, an industry standard which states that "[w]hen the [ready-mixed concrete] purchaser requires the manufacturer to assume full responsibility for the selection of the proportions for the concrete mixture ... [u]nless otherwise specified the age at [compressive strength] test shall be 28 days"; (3) the time when the manholes would be bored through, except that the boring would occur at a future date; (4) concrete's propensity to gain strength over time; (5) concrete's propensity to gain strength when exposed to water; and (6) that adding fly ash would result in an increase in the concrete's strength over time.

The only way to accurately predict the strength of concrete at a specific time is to test samples of identical concrete at that specific time. For example, to determine what strength a particular concrete will reach after one year, samples of the concrete will have to be tested one year after the samples were poured.

It is conventional to describe concrete in terms of its 28–day strength. The proposed concrete sample test results provided to Jay Dee indicated 28–day strengths. Tews also wrote Jay Dee when all the manholes except one were poured, indicating that "[t]he 28 day strengths exceeded 600 psi on our test mixes." Rorison believed that after 28 days, concrete's ultimate strength would not increase in magnitude; he believed that concrete reaches 80–85% of its strength after 28 days.

The presence of water and the temperature in the tunnel were ideal curing conditions for concrete, which results in concrete gaining strength. Tews was aware of these conditions for the tunnel project.

Jay Dee poured the manholes in May and June of 1987. For various reasons, the tunnel project was delayed and Jay Dee therefore did not commence boring through the manholes for slightly more than one year after the concrete was poured. Neither Jay Dee nor Tews contemplated at the time the concrete was ordered that the boring would occur one year after the concrete was poured.

When the TBM reached the first manhole plug to bore through, it was unable to advance because the concrete was too hard for the TBM to penetrate. The concrete strength in the plugs had increased to a strength in the range of 1560 psi to 3965 psi, averaging four times the strengths Jay Dee had anticipated. The TBM was damaged and Jay Dee had to use extraordinary measures to excavate the concrete from the first as well as the three remaining manholes. In proceeding with the boring of the tunnel, Jay Dee relied on its belief that the concrete would not harden by such a magnitude after one year. Neither Jay Dee nor Tews expected that the manhole concrete would increase in strength from the 28–day strength by 400%.

## CONCLUSIONS OF LAW

Both parties agree that there was a contract between Jay Dee and Tews as to the weak concrete, and that the Wisconsin ver-

sion of the Uniform Commercial Code applies.

*Express Warranty*

Jay Dee argues that Tews breached an express warranty. The relevant Wisconsin statute reads:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Wis.Stat. § 402.313 (1989–90). Jay Dee argues that Tews made an express warranty "that the concrete would be strong enough to hold back unstable soil, but weak enough so that a tunnel boring machine with the capacity to bore through strengths of 1000 psi could bore through it; further that the strength of the concrete would remain in the range of 600 to 800 psi and would not exceed 1000 psi." Jan. 21, 1992 "Plaintiff's Opening Statement and Proposed Findings of Fact and Conclusions of Law" ("Plaintiff's Brief") at 10.

■ Jay Dee bears the burden of proving that Tews made factual representations about the concrete's quality and condition. *Ewers v. Eisenzopf,* 88 Wis.2d 482, 487, 276 N.W.2d 802 (1979). The only affirmation of fact made by Tews relevant to this case was that the concrete 28–day strength would be 605 psi. There was no discussion between the parties or understanding by Tews regarding the concrete's use or requirements at a time one year later. Neither party contemplated such an extreme delay in the boring process. Tews made no statements regarding the strength the concrete would reach after 28 days; nor did Tews make any statement regarding what the concrete characteristics in the tunnel application would be (i.e. whether it would be strong enough to hold back soil but weak enough for the TBM to go through). There was not an affirmation of fact, promise, description, or sample representing what the concrete's one-year strength would be that became the basis of the bargain, and therefore there was no breach of an express warranty by Tews.

*Implied Warranty of Merchantability*

■ Jay Dee argues that Tews breached an implied warranty of merchantability. The relevant Wisconsin statute reads:

(1) Unless excluded or modified (s. 402.16), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind....

(2) Goods to be merchantable must be at least such as:

(a) Pass without objection in the trade under the contract description; and

(b) In the case of fungible goods, are of fair average quality within the description; and

(c) Are fit for the ordinary purposes for which such goods are used; and

(d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) Are adequately contained, packaged, and labeled as the agreement may require; and

(f) Conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (s. 402.316) other implied warranties may arise from course of dealing or usage of trade.

Wis.Stat. § 402.314 (1989–90). Jay Dee argues that "[b]ecause the 'weak concrete' Tews provided Jay Dee had hardening characteristics making it not reasonably fit for the general purposes for which such 'weak concrete' was sold and because Tews failed to advise Jay Dee of those hardening characteristics, Tews breached its implied warranty of merchantability." Jan. 21, 1992 Plaintiff's Brief at 10.

"[T]he ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question." U.C.C. § 2–315 Comment 2. In this case, both parties agree that the application of the weak concrete and the entire manhole procedure were unique; the use of the weak concrete by Jay Dee was not "ordinary." Therefore there was no breach of an implied warranty of merchantability by Tews.

*Implied Warranty: Fitness for Particular Purpose*

Jay Dee argues that Tews breached an implied warranty of fitness for a particular purpose. The relevant Wisconsin statute reads:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under s. 402.316 an implied warranty that the goods shall be fit for such purpose.

Wis.Stat. § 402.315 (1989–90). Jay Dee argues that "Tews had reason to know the particular purpose for which the concrete was required and that Jay Dee was relying on Tews' skill and judgment to select and furnish suitable concrete.... Because the concrete was not suitable for Jay Dee's particular purpose, Tews breached its im-

plied warranty of fitness for particular purpose." Jan. 21, 1992 Plaintiff's Brief at 9–10.

In order for there to be an implied warranty of fitness for particular purpose, "[t]he buyer, of course, must actually be relying on the seller." U.C.C. § 2–315 Comment 1. "Of course abnormal or unique use may result in the prevention of the application of this implied warranty." *Recreatives, Inc. v. Myers*, 67 Wis.2d 255, 264, 226 N.W.2d 474 (1975) (quoting Alphonse Squillante and John Fonseca, 3 Williston on Sales § 19–6 at 120 (4th ed. 1974)). Additionally, the seller must select the goods. *Ewers*, 88 Wis.2d at 491, 276 N.W.2d 802.

In this case, Jay Dee, an expert in tunneling, created a unique application for weak concrete and decided what the strength specifications should be. Tews is not an expert in tunneling. The ultimate application of the concrete's use was in the hands of Jay Dee. Jay Dee did not rely on Tews to design a concrete mix that would meet certain specific requirements after a year. Jay Dee has not met its burden to show that an implied warranty of fitness for particular purpose, i.e., use of the weak concrete one year later, was created. The burden to follow the concrete's development to its ultimate application after a period of time not contemplated by either party, should not be placed on Tews.

IT IS THEREFORE ORDERED that this court finds in favor of the defendant, Tews Company, Inc., and this action is DISMISSED on the merits.

IT IS FURTHER ORDERED that the Clerk of Court enter judgment in favor of the defendant, with costs awarded to the defendant.

IT IS FURTHER ORDERED that all pending motions in this action are DENIED AS MOOT.