Present: All the Justices

CHARLES E. BRAUER CO.,
INC., ET AL.

OPINION BY JUSTICE A. CHRISTIAN COMPTON

v. Record No. 950361                         January 12, 1996

NATIONSBANK OF VIRGINIA,
N.A., ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Melvin R. Hughes, Jr., Judge


This appeal stems from a routine commercial banking transaction in which a defaulting debtor's business ultimately failed and there was an unsuccessful liquidation of assets. When sued by a lending institution for repayment of funds advanced, the debtor alleged by counterclaims and a separate suit that the bank was guilty of tortious breach of a duty of good faith, breach of contract, failure to deal with collateral in a commercially reasonable manner, conspiracy, and tortious interference with contract. The trial court rejected these claims, and we confirm the trial court's action.

Contrary to the debtor's assertions on appeal, there are no material facts genuinely in dispute. Appellant Charles E. Brauer Co., Inc., was a Richmond wholesaler of institutional frozen and canned foods, tobacco, candy, and paper products. This family business was principally operated by appellant Charles P. Inman, Jr., vice president of the company. His father, appellant Charles P. Inman, Sr., was president of the company. For clarity, the company and the Inmans will sometimes be collectively referred to as the debtor.

In December 1990, the company entered into a commercial loan agreement with appellee NationsBank of Virginia, N.A. (formerly Sovran Bank), under which the bank agreed to provide the company a line of credit in the amount of $850,000. These negotiations were handled for the company by Inman, Jr., a former accountant and college professor. Primarily, the line of credit was to be used for the purchase of inventory, but the funds could be spent for general operating expenses.

Inman, Jr., executed on behalf of the company a "Grid Note" in the foregoing face amount reflecting its agreement to repay the bank the money borrowed under the line of credit. The father and son executed separate agreements guaranteeing the company's obligations under the note. As security for extending the line of credit, the bank obtained a first priority security interest in all the company's inventory and accounts receivable pursuant to two security agreements.

When Inman, Jr., was negotiating the line of credit, he also had discussions with NationsBank about the financing of construction of a new Richmond area warehouse into which the company's operations could be moved. He planned to own the facility and lease it to his company. The bank agreed to finance the warehouse construction and subsequently loaned Inman, Jr., $1,075,000 to build the facility. In order to make the real estate loan, however, the bank required Inman, Jr., to have about 10% to 15% equity in the real estate securing the loan; he lacked

such resources.  Ultimately, the bank agreed to allow Inman, Jr., to borrow funds from the company's line of credit to provide the necessary equity, and to pay certain construction costs.

Construction of the warehouse was completed in July 1991. Approximately $300,000 had been drawn on the line of credit for costs related to construction, an amount carried on the company's books as a loan from the company to Inman, Jr.  About the time the construction was completed, the company reached the limit of withdrawals under the line of credit of $850,000.

Later in 1991, Inman, Jr., sought additional funds from the bank because the company was not making "as much profit as anticipated."  According to Inman's testimony, he asked Jack Robeson, the bank's commercial loan officer with whom Inman had been dealing, to advance the debtor an additional $300,000. Inman, Jr., testified that Robeson had orally promised him in the summer of 1990 to make more money available to the debtor in the future, if needed.  Robeson and the bank refused to advance additional funds during the latter part of 1991 due to the company's poor financial condition.  The company continued its business without the additional funds from NationsBank.  In November 1992, the debtor decided to cease business operations and to voluntarily liquidate its assets in order to pay its creditors.

When NationsBank determined the debtor was having financial problems, the bank retained appellee AMRESCO Institutional, Inc.,

to "manage and collect" the loans to the debtor. This relationship was created pursuant to a July 1992 Servicing Agreement between the bank and AMRESCO to administer the bank's "problem" loans.

In connection with the liquidation, the debtor interested two companies, Smyth Food Services, Inc., and T. W. Bonner, Inc., in purchasing substantial portions of the debtor's inventory. The debtor proposed to AMRESCO that the bank foreclose on the inventory and then sell it to Smyth and Bonner. After considering the proposal, the bank became concerned about selling that part of the inventory which consisted of food or candy because some of it was dated and "aged merchandise." The bank feared that claims would be made against it by ultimate purchasers of the goods who may become ill from consuming the food. Smyth and Bonner declined the bank's request for agreements indemnifying it against any losses it might suffer from such sales. Thus, the bank refused the debtor's proposal for such a disposition of the collateral.

Shortly thereafter, the bank and the debtor discussed the possibility of the debtor selling the inventory by means of a bulk sale, which would require the bank's consent to release its lien on the inventory being sold. Various disagreements arose about the terms of the sale and the circumstances under which the bank would release its lien. Eventually, however, some of the inventory was sold by the debtor with the bank's cooperation for

- 4 -

approximately $269,000.

Liquidation of the inventory failed to satisfy the debt owed the bank.  Subsequently, NationsBank filed actions against the company, Inman, Sr., and Inman, Jr., to collect the deficiency. The debtor filed various counterclaims against the bank as well as a separate action against AMRESCO.

These actions were consolidated by the trial court.  Two of the issues debated on appeal were disposed of pretrial. Following a four-day jury trial, after the evidence of the parties had been presented, the court granted the bank's motion to strike the debtor's evidence, and entered summary judgment.

In a November 1994 order from which we awarded this appeal, the trial court entered judgment as follows:  in favor of the bank against the company and Inman, Jr., in the principal amount of $506,343.10 plus interest, attorney's fees, and costs; in favor of the bank against Inman, Sr., in the principal sum of $436,355.29 plus interest, attorney's fees, and costs; and in favor of AMRESCO in the action against it brought by the company.

On appeal, the debtor contends, first, that the trial court erred in sustaining the bank's demurrer to Count I of the debtor's counterclaim.  This Count set forth a purported cause of action in tort seeking monetary damages for "NationsBank's breach of duty and obligation to [the company] to act in good faith in the performance of its agreement to provide line of credit financing for [the company] to purchase inventory."  In Count II

of the counterclaim, the debtor asserted a claim for damages for an alleged breach of contract. The debtor alleged: "NationsBank's failure to provide line of credit financing in accordance with the provisions of the Grid Note constituted a breach of its loan agreement with [the company]."

The trial court's order sustaining the demurrer to Count I does not assign a reason for the court's ruling. Nonetheless, it is apparent from the record that the court decided Virginia law does not recognize a separate cause of action in tort for a party's breach of the obligation of good faith found in Code § 8.1-203 of the Uniform Commercial Code (U.C.C.), and that the Count I tort claim duplicated the Count II breach of contract claim. The trial court was correct.

Code § 8.1-203 provides: "Every contract or duty within [the U.C.C.] imposes an obligation of good faith in its performance." Thus, while a duty of good faith and fair dealing exists under the U.C.C. as part of every commercial contract, we hold that the failure to act in good faith under § 8.1-203 does not amount to an independent tort. The breach of the implied duty under the U.C.C. gives rise only to a cause of action for breach of contract. Central Sav. & Loan Ass'n v. Stemmons Northwest Bank, 848 S.W.2d 232, 239 (Tex. Ct. App. 1992).

Second, the debtor contends the trial court erred in striking its evidence on the breach of contract claim. This claim had two bases: (a) the bank breached the oral

- 6 -

understanding Inman, Jr., had with Robeson by not advancing additional funds, and (b) the bank breached the terms of the loan documents by agreeing to allow the company to draw funds from the line of credit to be used for non-inventory purposes, that is, to be loaned to Inman, Jr., for construction of the warehouse. Neither theory has merit.

Even if Robeson orally promised to advance an additional $300,000, a fact the bank denies, the statute of frauds prohibits enforcement of such a promise. Any agreement or promise to lend money or extend credit in an aggregate amount of $25,000 or more must be in writing to be enforceable. Code § 11-2(9).

The debtor's alternative theory is that the bank breached the terms of the grid note by advancing to the company funds which it knew would be loaned to Inman, Jr., for construction. But the loan documents did not prohibit the bank from advancing funds to the company under the line of credit for purposes other than the purchase of inventory. Instead, the documents placed limits on the company regarding its use of the line of credit without the bank's permission. In addition, the bank had no legal duty to monitor the company's use of the funds received under the line of credit. Specifically, the bank had no legal obligation to ensure that the loan proceeds were being used solely for purchase of inventory. Thus, as a matter of law there was no breach of the terms of the loan documents by the bank.

Third, the debtor contends the trial court erred in granting

the bank's motion to strike on the claim that the bank acted in a commercially unreasonable manner and in bad faith when it "prevented" the company from "maximizing the proceeds" from the sale of the inventory.  We reject this contention.

The U.C.C. standard of commercial reasonableness is set forth in Code § 8.9-504, which deals with a secured party's right to dispose of collateral after default.  The statute provides, as pertinent, that the collateral may be disposed of by public or private proceedings and that "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable."  Code § 8.9-504(3).

The commercial reasonableness standard becomes relevant only when a secured lender "disposes" of the collateral.  Diversified Foods, Inc. v. First Nat'l Bank of Boston, 605 A.2d 609, 614 (Me. 1992).  The term "disposition" is not defined in the U.C.C., but the language of § 8.9-504(1) and (3) indicates that it means an actual transfer of an interest in the collateral by sale, lease, or contract.  General Elec. Capital Corp. v. Vashi, 480 N.W.2d 880, 881 (Iowa 1992).  Also, § 8.9-504(3) does not apply if the seller of the collateral is the borrower rather than the secured party.  Ambase Int'l Corp. v. Bank South, 395 S.E.2d 904, 907 (Ga. Ct. App. 1990).

In the present case, the bank, relying on the loan documents and the applicable law, justifiably elected not to have a § 8.9-504 foreclosure sale of the collateral because it could not reach

an agreement regarding indemnification.  When a debtor is in default under a security agreement, a secured party has the option to foreclose, to reduce the claim to judgment, or to "otherwise enforce the security interest by any available judicial procedure."  Code § 8.9-501(1).  The bank opted to proceed to judgment.

Therefore, because the bank did not "dispose" of the collateral but merely chose not to release its lien on the inventory and to proceed to judgment on its claim, the commercial reasonableness standard was inapplicable.  Moreover, the standard could not have applied to the proposed bulk sale because the company, not the bank, would have been the seller of the inventory.

Elaborating on its claim of breach of the duty of good faith regarding sale of the collateral, the debtor contends that the facts present "a unique situation in which NationsBank, while maintaining control over the collateral, refused to permit its sale to purchasers whom [the company] and Inman, Jr. had found and who were willing to purchase a substantial portion of the existing inventory for a substantial price."  Continuing, the debtor argues that to adopt the bank's contention that no breach occurred, "one must conclude that Virginia law permits the secured creditor to act as unreasonably as one can imagine with regard to its collateral and thereafter not be held accountable."

The simple answer to this contention is that the bank did

nothing more than exercise its rights provided in the loan documents and under the applicable law as it attempted to cooperate with the debtor in disposing of the inventory. The U.C.C. term "good faith" is defined as "honesty in fact in the conduct or transaction concerned." Code § 8.1-201(19). When, as here, parties to a contract create valid and binding rights, one party does not breach the U.C.C.'s obligation of good faith by exercising such rights. Mahoney v. NationsBank of Virginia, 249 Va. 216, 221, 455 S.E.2d 5, 8 (1995). Arguably, the bank's conduct was arbitrary, but it was not dishonest.

Fourth, the debtor contends that the trial court erred in striking its evidence on the debtor's conspiracy claim. The debtor sought to prove that the bank and AMRESCO "combined, agreed and mutually undertook to willfully and maliciously injure [the company] in its reputation, trade and business," in violation of Code § 18.2-499 (unlawful to combine to injure others in reputation, trade, business, or profession). The trial court did not err.

One of the requirements for recovery under the statute is a showing that "two or more persons" combined or acted in concert. Code § 18.2-499(a). Here, the record is clear that AMRESCO was the bank's agent retained to service "problem" loans, and that it acted within the scope of its agency. Under those circumstances, a conspiracy was a legal impossibility because a principal and an agent are not separate persons for purposes of the conspiracy

statute.  One entity existed, the bank, and a single entity cannot conspire with itself.  <u>Fox</u> v. <u>Deese</u>, 234 Va. 412, 428, 362 S.E.2d 699, 708 (1987).

Finally, the debtor contends that the trial court erred when it granted pretrial motions for summary judgment on the company's tortious interference with contract claim.  We disagree.

The debtor sought recovery of damages arising from the bank's and AMRESCO's alleged tortious interference with the company's "contractual relations and business expectancies" by, the debtor claims, intentionally disrupting the agreements with Smyth and Bonner for sale of the inventory.  As we already have demonstrated, the bank, and its agent, merely engaged in the lawful exercise of the bank's statutory and contractual rights which incidentally may have interfered with the company's private negotiations for sale of the inventory.  But such conduct is not actionable and will not support recovery for tortious interference with contractual relations.

Consequently, we hold there is no error in the judgment below, and it will be

<u>Affirmed</u>.