Unified Judicial System

 

 
 Formatting provided courtesy of State Bar of South Dakota
and South Dakota Continuing Legal Education, Inc.
222 East Capitol Ave.
Pierre, SD 57501-2596 
DIAMOND SURFACE, INC.,
a corporation with its principal place of business
at Maple Grove, Minnesota,
Plaintiff and Appellant,
v.
THE STATE CEMENT PLANT COMMISSION,
a public corporation and agency operating the Cement Plant
at Rapid City, South Dakota,
Defendant and Appellee.

South Dakota Supreme Court
Appeal from the Seventh Judicial Circuit, Pennington County, SD
Hon. Thomas L. Trimble, Judge
#20112--Affirmed

Ronald G. Schmidt, Schmidt, Schroyer, Moreno & Dupris, Pierre, SD
Attorneys for Plaintiff and Appellant.

James S. Nelson, Paul S. Swedlund
Gunderson, Palmer, Goodsell & Nelson, Rapid City, SD
Attorneys for Defendant and Appellee.

Argued Jun 2, 1998; Opinion Filed Aug 19, 1998

GILBERTSON, Justice.
[Â¶1] Diamond Surface, Inc., a Minnesota corporation, brought suit against the South Dakota State Cement Plant Commission (SDCP), the South Dakota Department of Transportation (DOT), and Western Ash Company after completion of a highway paving project near Edgemont, South Dakota. DOT and Western Ash Company settled and were dismissed prior to trial. Diamond Surface alleged SDCP supplied defective cement which resulted in premature drying or stiffness of the concrete used in the paving project. After submission of Diamond Surface's case, the trial court granted SDCP's motion for directed verdict on the following counts: negligence; breach of implied warranty of fitness for a particular purpose; breach of the Uniform Commercial Code's (UCC) obligation of good faith and fair dealing; fraud and deceit; and violation of industry standards. Diamond Surface's remaining claim, breach of implied warranty of merchantability, was submitted to the jury. The jury returned a verdict for SDCP. Diamond Surface appeals the grant of directed verdict but not the jury verdict. We affirm.
FACTS AND PROCEDURE 
[Â¶2] Diamond Surface was the successful low bidder on a 1.3 mile long, 44 foot wide, eight inches deep, paving project on Highway 18 near Edgemont. Diamond Surface's owner, Terry Kraemer (Kraemer) had accepted a guaranteed price quotation from SDCP for the cement to be used on the project.(1)  Rather than submit its own concrete mix design, Diamond Surface selected a DOT tested and pre-approved mix design for the project. Diamond Surface also optioned to substitute fly ash for a portion of the cement. Fly ash has binding qualities similar to concrete but is cheaper. On the first day of the project it was observed that the concrete was setting up or drying too quickly and could not be worked with to produce an acceptable surface as it came out of the back side of the paver. This complication is known as "false setting" and Diamond Surface alleges this was the cause of a poor finish and difficulties encountered throughout the project.
[Â¶3] Diamond Surface claimed the false setting was caused by defective cement received from SDCP and sought damages of $164,000 at trial for the additional time and labor expended to complete the project. SDCP denied its cement was the cause of the false setting and attributed the problems to several factors, including Diamond Surface's unique paving methods, substandard equipment, disorganization and inexperience among the paving crew, and delays in placing the concrete.
[Â¶4] Diamond Surface's initial complaint alleged: negligence; breach of the implied warranties of merchantability and fitness for a particular purpose; breach of the UCC obligation of good faith and fair dealing; fraud and deceit upon which punitive damages should be awarded; and violations of industry standards. The punitive damage and negligence claims were dismissed by the trial court prior to trial but Diamond Surface was allowed to re-assert these claims by subsequent amendment.
[Â¶5] A five-day trial was held in May 1997. At the close of Diamond Surface's case, the trial court directed a verdict in favor of SDCP on all grounds except the merchantability claim. The jury then decided that SDCP did not breach the implied warranty of merchantability. Diamond Surface does not appeal the jury verdict.
[Â¶6] The Edgemont project was completed in 1993 over the course of eight days in two distinct phases. The eastbound lane was paved first on August 28, 30, 31, September 1, and 13 (Phase I). The westbound lane was paved from October 4th through the 6th (Phase II).
[Â¶7] On the day Diamond Surface began, problems with the project were observed by DOT, which ordered the crew to stop paving after just 150 feet of road surface was laid. Several reasons were cited, including lack of an oscillating transverse screed, inadequate concrete depth, using too much water, and producing a rough finish. The paver was out of alignment. Furthermore, rather than using a standard belt placer or spreader, a piece of equipment that travels in front of the paver at the same pace and uniformly delivers concrete to the front of the paver, Diamond Surface used the front end bucket of a Bobcat to place the concrete in front of the paver. The crew then tore out and disposed of the rejected concrete.
[Â¶8] Dan Johnston (Johnston), a DOT engineer, testified that in nearly twenty years of experience he had never seen or even heard of placing concrete in front of a paver with a Bobcat. Johnston testified that picking up small loads of concrete with the Bobcat exposed it to air and caused it to dry out more quickly and the repeated handling could cause the concrete to begin to set up before it could be finished. Furthermore, since the concrete was delivered in dump trucks, rather than concrete trucks, it could not be remixed.
[Â¶9] Dan Vockrodt (Vockrodt), a DOT engineer, performed tests on the concrete the first day of paving and did not observe any false setting complications. He noticed that the crew was having problems finishing the concrete and attributed them to the crew's problems with "a little bit of everything." These problems included the paver being out of alignment and having to be picked up and straightened out, concrete thickness less than that required, using the Bobcat to place the concrete, and allowing concrete to sit in dump trucks during delays.
[Â¶10] Diamond Surface had difficulties with equipment on the project. The paver being used was unacceptable according to DOT standards and rejected because it did not have an oscillating screed, a basic attachment that vibrates the concrete as it runs through the paver, eliminates pockets of air, and produces a smooth finish. Vockrodt was present on most paving days and noted in his diary that on October 4, 1993, the operation began "running smoothly" after Diamond Surface began using the proper equipment and used "straight cement" with no fly ash.(2) 
[Â¶11] SDCP claimed that another factor that contributed to the premature drying of the concrete was Diamond Surface's failure to adhere to DOT standards which require that the subgrade be watered prior to placing the concrete. Vockrodt testified this was one of the reasons he shut the operation down on the first day. The purpose of adding water is to prevent the dry subgrade from absorbing the water contained in the cement and causing it to stiffen prematurely. Randy Bohne (Bohne), the batch plant operator, noted that the crew "finally" started to water down the subgrade on October 4, 1993, when Phase II began.
[Â¶12] SDCP also attributed any alleged false setting behaviors to numerous delays in placing the concrete. DOT specifications require that concrete be placed in front of the paver no later than 45 minutes after leaving the batch plant. While the batch plant used in this project was less than one mile away from the project site, several witnesses observed that, on occasion, Diamond Surface failed to get the concrete placed within the 45-minute requirement. Vockrodt observed that due to frequent paver problems, dump trucks filled with concrete were forced to wait.
[Â¶13] While SDCP claimed the concrete ceased to exhibit false setting behaviors after the new equipment and Kraemer arrived on the site during Phase II, Diamond Surface claimed the concrete continued to false set throughout the remainder of the project. Kraemer initially complained to SDCP after the August 28, 1993 complications. Paul Minor (Minor) and Court Patterson (Patterson), SDCP employees, believed the cement was not false setting. Minor suggested that the fly ash could be causing the problem. Diamond Surface chose to continue to use the fly ash through the remainder of Phase I. The trial court heard testimony from both Diamond Surface and SDCP experts who agreed that the fly ash contained materials that may react with or accelerated concrete causing it to dry out.
[Â¶14] The trial court also received evidence of several concrete tests conducted before, during, and after the project was completed. SDCP cement is manufactured to conform to specifications set forth by the American Society of Testing Materials (ASTM). According to Patterson, cement meets industry standards if it passes the ASTM C-150. Within ASTM C-150 are approximately twenty subtests. At least two of these subtests, ASTM C-451 and C-359, are elective and can detect false setting behavior. Diamond Surface argues that the ASTM C-359 test should have been conducted to detect false setting. SDCP claimed the ASTM C-451 was the proper test to detect false setting and that ASTM C-359 was not a test but merely a research tool because it does not contain any pass/fail criteria and is not commonly used in the industry.
[Â¶15] SDCP supported its claims by offering expert testimony from William Hime (Hime) concerning technicalities of cement and concrete usage and testing. Hime had participated in an extensive survey of testing procedures conducted in cement plants in the United States, Canada, and Mexico. The survey concluded that every plant used the ASTM C-150 test, 34% used the optional ASTM C-451, and none used the ASTM C-359 test that Diamond Surface alleges should have been used. Patterson admitted not using the C-359 test when Minor initially requested he investigate the cement. Patterson, however, did conduct a C-359 in November 1993. Both sides presented expert testimony on the results of this test supporting their position as to whether the tests indicated false setting. SDCP claims that cement from both before and after Diamond Surface's complaints passed the ASTM C-150 and C-451. Evidence was presented, however, that a sample could pass the C-150 and still false set and that the C-451 may not have been appropriate for the conditions utilized in slip form(3)  paving operations where the concrete is not agitated after leaving the batch plant.
[Â¶16] The "slump test" is another test utilized in the concrete industry to determine workability and detect false setting. A slump test is performed by pouring concrete through the opening of a twelve (12) inch mold. The mold is removed and the distance the concrete flattens or slumps is measured. SDCP cement was tested several times after September 2, 1993, each time with acceptable results.
[Â¶17] On October 20, 1993, two weeks after completion of the project, Kraemer obtained a cement sample from the Hills Materials' batch plant. The sample was tested by American Testing who concluded the sample exhibited severe false setting tendencies. The SDCP produced evidence that the single testing sample used had been obtained from a bottom storage hatch thereby becoming aerated and contaminated with moisture. The contamination allegedly continued when Kramer stored the samples in his trunk and office for several days before submitting it for testing.
[Â¶18] Diamond Surface raises the following issues for our review:
1. Whether the trial court erred in directing a verdict in favor of SDCP on the negligence claim based upon the economic loss rule.
2. Whether the trial court erred in directing a verdict in favor of SDCP on the claim of implied warranty of fitness for a particular purpose based upon insufficiency of the evidence.
3. Whether the trial court erred in directing a verdict in favor of SDCP on the claim of breach of the UCC obligation of good faith and fair dealing.
4. Whether the trial court erred in directing a verdict in favor of SDCP on the claims for fraud, deceit, and punitive damages.
5. Whether the trial court erred in directing a verdict in favor of SDCP on the claim for violation of industry standards.
[Â¶19] By notice of review, SDCP raises the following issues:
1. Whether the trial court, having entered certain findings of fact and conclusions of law in the case during the determination on punitive damages, erred in not applying those findings and conclusions as the law of the case and instructing the jury thereon.
2. Whether the trial court erred in admitting evidence of testing of cement by SDCP performed two years before the cement at issue was produced.
STANDARD OF REVIEW 
[Â¶20] Our standard of reviewing directed verdicts is well settled.
A motion for a directed verdict under SDCL 15-6-50(a) questions the legal sufficiency of the evidence to sustain a verdict against the moving party. Upon such a motion, the trial court must determine whether there is any substantial evidence to sustain the action. The evidence must be accepted which is most favorable to the nonmoving party and the trial court must indulge all legitimate inferences therefrom in his favor. If sufficient evidence exists so that reasonable minds could differ, a directed verdict is not appropriate. The trial court's decisions and rulings on such motions are presumed correct and this Court will not seek reasons to reverse.
Bland v. Davison County, 1997 SD 92, Â¶26, 566 NW2d 452, 460 (citation omitted).

ANALYSIS AND DECISION 
[Â¶21] 1. Whether the trial court erred in directing a verdict in favor of SDCP on the negligence claim based upon the economic loss rule.
[Â¶22] Diamond Surface relies heavily on our decision in L.R. Foy Construction Co v. South Dakota State Cement Plant Commission, 399 NW2d 340 (SD 1987), in its claim that the trial court erred in its grant of directed verdict on the negligence claim based upon the economic loss rule. The economic loss rule holds that "purely economic interests are not entitled to protection against mere negligence." Bamberger & Feibleman v. Indianapolis Power & Light Co., 665 NE2d 933, 938 (IndCtApp 1996) (citing W. Prosser, Handbook on the Law of Torts Â§101, at 665 (4th ed. 1971), for the proposition that "when there is no accident and no physical harm so that the only loss is pecuniary" a negligence action will not lie); see also Agristor Leasing v. Spindler, 656 FSupp 653, 656-57 (DSD 1987) (noting that the Restatement (Second), Torts Â§395 (1965) as well as almost all courts faced with this issue "have evinced a uniformly hostile attitude toward claims ... for economic loss based on negligence theories"); Broce-O'Dell Concrete Products, Inc. v. Mel Jarvis Constr. Co., Inc., 634 P2d 1142, 1145 (KanCtApp 1981) ("If the result is simple economic loss, liability and damages are governed by breach of contract principles."); Cf. Sundt v. State ex rel SD Dep't of Transp., 1997 SD 91, 566 NW2d 476 (reaffirming Fisher Sand & Gravel Co. v. State ex rel SD Dep't of Transp., 1997 SD 8, 558 NW2d 864, that "there can be no cause of action sounding in negligence unless there is a legal duty which arises independent of the duties under the contract").
[Â¶23] In L.R. Foy, we reversed and remanded for trial a concrete purchaser's claims against the SDCP which had been dismissed by the trial court after it concluded that the 4-year statute of limitations, imposed by the UCC for breach of contract claims (as per SDCL 57A-2-725), and sovereign immunity precluded suit on the tort claims. We held that sovereign immunity did not preclude commercial tort claims against SDCP because its activities were commercial rather than governmental in nature. 399 NW2d at 346-47. Contrary to Diamond Surface's claim, we did not address whether the economic loss rule precludes a negligence claim. This Court merely held that SDCP may be held liable for commercial torts. Id.
[Â¶24] We adopted the economic loss rule seven years after L.R. Foy. City of Lennox v. Mitek Indus., Inc., 519 NW2d 330, 333 (SD 1994). In Mitek Indus., we affirmed summary judgment against the City of Lennox, which had brought suit against a subcontractor that supplied roofing trusses for a municipal building as well as a supplier of component parts for the trusses. After the trusses failed, the City claimed breach of contract, breach of implied warranties, and negligence. We followed a two-step analysis in applying the economic loss rule. First, we addressed whether the transaction was a sales transaction which would bring it within the scope of the UCC. Id. at 332. We held the UCC applied since the predominate purpose of the transaction was the sale of "goods" as defined by SDCL 57A-2-105(1). At present, SDCP agreed to supply goods, namely cement, for the Edgemont project. Because the UCC governed, we next determined
whether the losses claimed under the negligence causes of action are recoverable in tort or whether the UCC provisions are exclusive. The general rule is that economic losses are not recoverable under tort theories; rather, they are limited to the commercial theories found in the UCC. Agristor Leasing v. Spindler, 656 FSupp 653 (DSD 1987). This Court has never directly addressed this issue. In Agristor the court addressed that fact and stated that "[t]he South Dakota Supreme Court has not directly decided the issue. Indications are, however, that South Dakota will adopt the approach of the California Supreme Court [citation omitted]. Recovery of economic losses is limited to the remedies of the Uniform Commercial Code." Agristor, 656 FSupp at 655.(4) 
Mitek Indus., 519 NW2d at 333 (emphasis added).
[Â¶25] We went on to adopt the general rule, its two recognized exceptions,(5)  and the rationale behind it as explained in Hapka v. Paquin Farms, 458 NW2d 683, 688 (Minn 1990), where the court stated:
The Code not merely permits but also encourages negotiated agreements concerning all aspects of a commercial transaction including warranties, warranty disclaimers, and liability limitations. The foundational assumption of the Code as a whole is that by importing to their negotiations their experience in the marketplace, the reasonable contemplation of sophisticated parties is embodied in the transaction. It is at the time of the contract formation that experienced parties define the product, identify the risks, and negotiate a price of the goods that reflects the relative benefits and risks to each.
Mitek Indus., 519 NW2d at 333.
Economic loss ... is defined as that loss resulting from the failure of the product to perform to the level expected by the buyer and the consequential losses resulting from the buyer's inability to make use of the ineffective product, such as lost profits.
Id. (emphasis in original); accord Bamberger, 665 NE2d at 938-939 (holding that economic losses are not recoverable in a negligence action simply because the product failed to perform as expected absent injury to person or property). We concluded that damages claimed by the City of Lennox were "in reality repair costs that fall under consequential damages. Therefore, the economic damages are not recoverable under the tort theory of negligence and instead are governed by the UCC." Id. at 333-34.
[Â¶26] Diamond Surface has failed to demonstrate that the damages sought under its negligence claim for increased time and labor expended as a result of the allegedly defective cement were for anything other than consequential losses. Therefore, the trial court's directed verdict on the negligence count is affirmed.
[Â¶27] 2. Whether the trial court erred in directing a verdict in favor of SDCP on the claim of implied warranty of fitness for a particular purpose based upon insufficiency of the evidence.
[Â¶28] In granting a directed verdict on this claim, the trial court found that there was insufficient evidence that the cement was to be used for a purpose other than general highway construction or that Diamond Surface relied on SDCP. Diamond Surface has failed to demonstrate error. SDCP produced over 1.5 billion pounds of cement in 1993. Over 90% of the cement produced is a general purpose cement designed to exceed ASTM requirements in several respects so that it can be used in a variety of settings including bridge decks, sidewalks, foundations, highways and buildings. This general purpose cement is used for all types of highway paving processes including slip-form. Patterson testified that due to the large volume of cement produced, SDCP does not customize its cement for specific projects.
[Â¶29] Diamond Surface claims that slip form paving is a "particular purpose" for purposes of the UCC 2-315 implied warranty as recognized by SDCL 57A-2-315 which provides:
Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under Â§57A-2-316 an implied warranty that the goods shall be fit for such purpose.
[Â¶30] The finding of an implied warranty of fitness for a particular purpose is contingent on three facts:
1. The seller must have reason to know the buyer's particular purpose.
2. The seller must have reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods.
3. The buyer must, in fact, rely upon the seller's skill or judgment.
1 James J. White & Robert S. Summers, Uniform Commercial Code Â§9-10 (4th ed. 1995) (footnote omitted).
[Â¶31] Even if we were to agree with Diamond Surface that slip form paving is a particular purpose, Diamond Surface's claim must fail under the first factor as the record is barren of any evidence indicating SDCP knew, or should have known, the cement requested would be put to a purpose other than general highway construction.(6)  Importantly, Kraemer has conceded that he never informed SDCP of the details of the slip form project when he requested the bid. Additionally, Kraemer never requested input from SDCP on the use of nonagitating equipment or the particular fly ash added at the batch plant. Fundamental is the notion that, "[i]f a buyer is relying on the skill and judgment of the seller but the seller is not aware of this reliance or of buyer's particular purpose, no [implied warranty for a particular purpose] exists." Id. (collecting cases) (emphasis added). See also Wisconsin Elec. Power Co. v. Zallea Brothers, Inc., 606 F2d 697 (7thCir 1979) (holding that product was not sold with implied warranty for a particular purpose where buyer never communicated to seller the particular purpose for which the product would be needed); accord Bergquist v. Mackay Engines, Inc., 538 NW2d 655, 658 (IowaCtApp 1995). There is no evidence that Diamond Surface communicated to SDCP a purpose other than general highway construction or that slip form paving is a particular use thereby implicating the implied warranty for a particular purpose.
[Â¶32] Under the present facts, we decline to require "[t]he burden to follow the concrete's development to its ultimate application" upon SDCP in the absence of a showing that SDCP knew, or had reason to know, of Diamond Surface's particular purpose. Jay Dee Contractors, Inc., v. Tews Co., Inc., 787 FSupp 160, 164 (ED Wis 1992).
[Â¶33] Diamond Surface also contends it relied on SDCP's skill and judgment in selecting cement suitable for slip-form paving operations rather than cement fit for ordinary highway construction. It is an elementary proposition that "[t]he buyer, of course, must actually be relying upon the seller" for there to be an implied warranty of fitness for a particular purpose. Id. (quoting UCC Â§2-315 Comment 1). "Of course abnormal or unique use may result in the prevention of the application of this implied warranty." Id. (citations omitted). The court in Jay Dee dismissed the concrete purchaser's claim of breach of implied warranty for a particular purpose after concluding that the "ultimate application of the concrete's use was in the hands of [the purchaser]." Id. The trial court's order is affirmed on this issue.
[Â¶34] 3. Whether the trial court erred in directing a verdict in favor of SDCP on the claim of breach of the UCC obligation of good faith and fair dealing.
[Â¶35] The trial court granted a directed verdict in favor of SDCP on the breach of UCC obligation of good faith and fair dealing. The trial court based its decision upon the absence of privity of contract between Diamond Surface and SDCP. The trial court reached the right result, although its reasoning was incorrect.
[Â¶36] SDCL 57A-1-203, which is Uniform Commercial Code Â§1-203, provides that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement." (emphasis added). Good faith is defined as "honesty in fact in the conduct or transaction concerned." SDCL 57A-1-201 (19). SDCL 57A-1-203, by its plain language, imposes the duty of good faith in commercial transactions upon both contracts and duties. Id. See Garrett v. BankWest, Inc., 459 NW2d 833, 844 (SD 1990) (noting that SDCL 57A-1-203 "requires a contract or duty").
[Â¶37] This Court addressed the good faith obligation in both the tort and contract settings in Garrett, supra. We declined to "create an independent tort of breach of good faith independent of contract or duty arising under contract." Id. at 842. We decided that a claim of breach of good faith, whether under general contract terms or under the UCC implied covenant of good faith, cannot survive in the absence of a contract. Id. at 844.
The application of this implied covenant allows an aggrieved party to sue for breach of contract when the other contracting party, by its lack of good faith, limited or completely prevented the aggrieved party from receiving the expected benefits of the bargain. A breach of contract claim is allowed even though the conduct failed to violate any of the express terms of the contract agreed to by the parties.
Garrett, 459 NW2d at 841 (citations omitted).
[Â¶38] Our decision was in accord with the line of authority holding that a failure of one contracting party to act in good faith, within the meaning of the general provisions of UCC Â§1-203, in performance of contract or duties under UCC does not give rise to an independent cause of action for damages in favor of other party.(7)  Management Assistance, Inc. v. Computer Dimensions, Inc., 546 FSupp 666 (NDGa 1982) (construing Ga UCC); accord Baxter Healthcare Corp. v. O.R. Concepts, Inc., 69 F3d 785 (7thCir 1995); Cambee's Furniture, Inc. v. Doughboy Recreational, Inc., 825 F2d 167, 175 (8thCir 1987) (holding the implied covenant of good faith and fair dealing does not state a claim separate from the breach of contract claim); Tanner v. Church's Fried Chicken, Inc., 582 So2d 449 (Ala 1991); Government Street Lumber Co. Inc. v. AmSouth Bank, N.A., 553 So2d 68 (Ala 1989) (holding the UCC provision that every contract or duty within Code imposed obligation of good faith in its performance or enforcement was directive, not remedial, and it did not give rise to independent cause of action); Charles E. Brauer Co., Inc. v. Nationsbank of Va., N.A., 466 SE2d 382 (Va 1996); Cheryl Anderson, Lender Liability: Breach of Good Faith in Lending and Related Theories, 64 NDLRev 273, 281 (1988) (Although UCC Â§1-203 requires good faith in the transaction, it only "constitutes a general definition of good faith applicable to the Code and does not provide a separate cause of action ... .")
[Â¶39] The duty of good faith "must arise from the language used or it must be indispensable to effectuate the intention of the parties." Garrett, 459 NW2d at 841 (citation omitted). Diamond Surface has merely restated its claim for breach of warranty of fitness for particular purpose under the guise of a UCC good faith obligation claim by vaguely claiming SDCP represented its cement was fit for this specific paving project. SDCL 57A-1-203.
[Â¶40] Therefore, the trial court decided the UCC good faith issue right for the wrong reason and is affirmed on this issue. Seymour v. Western Dakota Vocational Technical Institute, 419 NW2d 206, 209 (SD 1988); Owens v. City of Beresford, 87 SD 8, 15, 201 NW2d 890, 893, 60 ALR3d 707 (1972).
[Â¶41] 4. Whether the trial court erred in directing a verdict in favor of SDCP on the claims for fraud, deceit, and punitive damages.
[Â¶42] The trial court found no evidence of fraud or deceit concerning SDCP or any of its employees and therefore directed a verdict in favor of SDCP. The trial court had earlier dismissed the claim for punitive damages after holding a hearing in accordance with SDCL 21-1-4.1 which provides:
In any claim alleging punitive or exemplary damages, before any discovery relating thereto may be commenced and before any such claim may be submitted to the finder of fact, the court shall find, after a hearing and based upon clear and convincing evidence, that there is a reasonable basis to believe that there has been willful, wanton or malicious conduct on the part of the party claimed against.
[Â¶43] Diamond Surface's claims on the issues of fraud, deceit, and punitive damages basically boil down to allegations that SDCP willfully failed to conduct the ASTM C-359 procedure after learning the concrete may be false setting and that SDCP employee Minor told Kraemer that fly ash may be the problem with the concrete.
[Â¶44] In dismissing Diamond Surfaces original punitive damages claim, the trial court found that the cement at issue passed the ASTM C-451 tests and that the ASTM C-359 method "does not contain a pass/fail or minimum acceptable figure for cement." The trial court concluded there was no evidence of "willful, wanton or malicious conduct" on the part of SDCP. Diamond Surface did not object to these findings of fact and conclusions of law.
[Â¶45] Furthermore, Diamond Surface did not appeal the jury verdict against it on the breach of implied warranty of merchantability claim. SDCL 57A-2-314 is the source for an implied warranty of merchantability claim and states in part that goods are merchantable if they "[p]ass without objection in the trade under the contract description[.]" Cement that exhibits false setting behaviors such as described by Diamond Surface would not pass without objection in the trade. Diamond Surface has failed to rationalize how an action for fraud or deceit, based upon the claim that the cement was to be fit for a particular purpose when SDCP was not aware of such a purpose, can survive based upon this record.
[Â¶46] 5. Whether the trial court erred in directing a verdict in favor of SDCP on the claim for violation of industry standards.
[Â¶47] The trial court was unsure whether a violation of industry standards claim is a separate cause of action. It decided that even if there was a separate cause of action
there is no evidence to show that there has been a violation of industry standards. There has been evidence that they have not used all the tests available, but not that those tests are required under the standards of the industry. There's no expert opinion on this matter regarding a violation[.]
[Â¶48] Diamond Surface concedes that the industry standards claim is a negligence claim. Therefore, our decision under issue one is controlling.
[Â¶49] We find Diamond Surface's additional arguments to be without merit and affirm the trial court. As a result, we need not consider the issues raised by SDCP through notice of review.
[Â¶50] AMUNDSON and KONENKAMP, Justices, concur.
[Â¶51] MILLER, Chief Justice, and SABERS, Justice, concur in part and dissent in part.

MILLER, Chief Justice (concurring in part and dissenting in part).
[Â¶52] I dissent as to issues 2 (involving a claimed warranty of fitness for a particular purpose) and 3 (relating to an implied warranty of good faith and fair dealing).
[Â¶53] 1. Fitness for a particular purpose.
[Â¶54] I would hold that in accepting the evidence which is most favorable to Diamond Surface, as we must, the trial court incorrectly granted a directed verdict on the issue of fitness for a particular purpose.
[Â¶55] Under our standard of review for a directed verdict, "[t]he evidence must be accepted which is most favorable to the nonmoving party and the trial court must indulge all legitimate inferences therefrom in his favor. If sufficient evidence exists so that reasonable minds could differ, a directed verdict is not appropriate." Bland v. Davison County, 1997 SD 92, Â¶26, 566 NW2d 452, 460 (emphasis added).
[Â¶56] As the majority opinion recognizes, three elements must be met for a claim of breach of the implied warranty of fitness for a particular purpose:
1. The seller must have reason to know the buyer's particular purpose.
2. The seller must have reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods.
3. The buyer must, in fact, rely upon the seller's skill or judgment.
[Â¶57] The majority opinion states at Â¶31 that "[t]here is no evidence that Diamond Surface communicated to SDCP a purpose other than general highway construction or that slip-form paving is a particular use thereby implicating the implied warranty for a particular purpose."
[Â¶58] I will initially address the majority opinion's assertion that there is no evidence that slip-form paving is a particular use within the meaning of SDCL 57A-2-315. First, I respectfully submit that the majority opinion does not even address this as an issue. The opinion, at Â¶31, discusses only that the seller must have reason to know the buyer's particular purpose, and never discusses what constitutes a particular purpose.
[Â¶59] I would hold that Diamond Surface presented evidence to establish that slip-form paving is a "particular purpose." It has been stated that:
A particular purpose within the scope of [SDCL 57A-2-315] is a use to which the goods are not ordinarily put. The Official Code Comment makes the distinction between the ordinary use of shoes and a buyer's intention to use shoes for mountain climbing as illustrating a particular purpose of the buyer; however, when shoes are sold as mountain climbing shoes their use for that purpose is not a use for a particular purpose.
3A Anderson, Uniform Commercial Code, Sales Â§2-315:95 (3dEd 1995); see also Wilson v. Marquette Electronics, Inc., 630 F2d 575, 581 (8thCir 1980) (holding that the use of a computer-assisted electrocardiograph system in an office rather than a hospital was a novel use for the equipment and gave rise to an implied warranty of fitness for a particular purpose); Lanphier Constr. Co. v. Fowco Constr. Co., 523 SW2d 29, 41 (TexApp 1975) (holding that the use of asphalt to pave parking areas and driveways was a "particular purpose"). The use of cement for slip-form paving is likewise a particular purpose, as the methods used in pouring it are unique from the general use of cement.
[Â¶60] I also would hold that in accepting the evidence most favorable to Diamond Surface, a jury question exists as to whether SDCP had "reason to know" of the particular purpose. I must first emphasize that Diamond Surface was not required to directly inform SDCP of its particular purpose. See 67A AmJur2d Sales Â§777 (1985) (stating that "[i]t is immaterial how the seller acquired knowledge of the buyer's particular purpose; such knowledge can be inferred from past dealings or conduct as well as communicated." (collecting cases)). There was evidence that Diamond Surface received a price quote from SDCP for this project and it was generally understood that this was a slip-form paving project. While the evidence may be weak, it surely exists to at least establish a jury question as to whether SDCP had "reason to know" this was a slip-form paving project.
[Â¶61] I would also hold there is adequate evidence on the last two factors under a fitness for a particular purpose claim to at least allow a jury to decide the matter. There was testimony from one of SDCP's employees that he was aware that its customers rely upon it for the technical knowledge and expertise to provide a product that is suitable and fit for their needs. Therefore, there is sufficient evidence to support the claim that SDCP had reason to know Diamond Surface was relying on it to provide suitable cement for this slip-form paving project. There was also testimony to support the claim that Diamond Surface did indeed rely on SDCP's skill or judgment. Terry Kraemer, owner of Diamond Surface, testified that he relied on SDCP to provide suitable cement for that particular project.
[Â¶62] In accepting the evidence most favorable to Diamond Surface, there is clearly a jury question as to whether the implied warranty of fitness for a particular purpose was breached. It should be up to a jury to place weight on the evidence, not the trial court. The jury was seated, sworn and prepared to render a decision. It should have been given the opportunity.
[Â¶63] 2. Implied covenant of good faith and fair dealing.
[Â¶64] While I agree with the majority opinion that SDCL 57A-1-203, the implied covenant of good faith and fair dealing, does not support an independent cause of action, I would reverse on this issue given my disposition of issue 2. I would hold that the obligation to act in good faith is tied to the duties arising under the warranty of fitness for a particular purpose claim. As SDCL 57A-1-203 states: "Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement." (Emphasis added.) Therefore, it is a jury question if this "good faith" standard was adhered to by SDCP under Diamond Surface's warranty of fitness for a particular purpose claim.
[Â¶65] I am authorized to state that Justice Sabers joins in this special writing.
1.  Concrete is a mixture of cement, sand, gravel, water, and occasionally other admixtures such as fly ash. SDCP manufactures cement, which is a fine, gray powder that strengthens and binds the components together over time. The cement then leaves SDCP and is delivered to batch plants which mix the concrete ingredients together. 
2.  The DOT imposes a seasonal limitation that prohibits the use of fly ash after October 1 of each year. 
3.  The "slip form" paving process basically entails pouring concrete into forms laid out along the roadway. 
4.  Several rationales have been offered to justify denying economic loss in negligence actions as restated in Agristor.
First, it is a general tort principle that economic interests are not entitled to protection against mere negligence. Prosser and Keeton, Handbook on the Law of Torts, Â§Â§95A, 101 (5th ed. 1984). Other reasons essentially echo those justifying the denial of economic loss in strict liability suits. The existence of more liberal privity requirements which expand warranty coverages and preventing an invasion into private contractual warranty agreements covered by the Uniform Commercial Code have been relied on extensively. Note, Economic Loss in Products Liability Jurisprudence, 66 ColumLRev at 930.
Agristor, 656 FSupp at 657. 
5.  Diamond Surface does not claim the transaction at issue falls under one of the two recognized exceptions to the general rule. One exception to the general rule is when personal injury is involved. Mitek Indus., 519 NW2d at 333 (citation omitted). The second exception may apply when the damage is to "other property" as opposed to the specific goods that were part of the transaction. Id. "Other property has been defined as damage to property collateral to the product itself." Id. (citation omitted). 
6.  The dissent claims "it was generally understood" between Diamond Surface and SDCP that the "slip-form" process would be used on the paving project. There is no evidence to support this assumption as indicated by the dissent's failure to cite to the record and its acknowledgment that the evidence of SDCP's knowledge in this respect "may be weak." Kraemer admitted at trial he did not inform SDCP that that the cement would be used on a slip-form paving process at the bid letting.
Attorney: [D]o you know whether or not you talked to anybody from [SDCP] that night about this particular project?
Kraemer: I think that Paul Minor brought it, or a representative from [SDCP] -- I know somebody from [SDCP] brought a quote to our motel room.
Attorney: Do you recall whether or not you talked to this individual?
Kraemer: ... I would have had at least said, "Hi."
Attorney: Do you talk to them about the details of the project?
Kraemer: No, we typically don't.
Attorney: In fact, other than the bid letting, you had no direct dealings with [SDCP] on this project until you talked to Paul Minor in September or October of that year; is that right?
Kraemer: That's right.
This testimony establishes that Kraemer never informed SDCP of the particular use for which the cement would be required. It is fundamental that, "A party cannot claim a version of the facts more favorable to himself than his own testimony." Trammell v. Prairie States Ins. Co., 473 NW2d 460, 463 (SD 1991). Furthermore, Diamond Surface does not allege that any other Diamond Surface representative informed SDCP it would need its cement for a "slip-form" paving project. There is simply no evidence here that SDCP had any knowledge that the general purpose cement requested would be put to a particular use. To the contrary, the evidence, as proffered by Diamond Surface, supports the view that SDCP did not have the requisite degree of knowledge. Thus, further inquiry under SDCL 57A-2-315 is not required. 
7.  Although South Dakota did not adopt the UCC comments, we may still look to them for guidance. The UCC's Permanent Editorial Board has recently clarified 1-203's Official Comment as follows:
This section does not support an independent cause of action for failure to perform or enforce in good faith. Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial right or power. This distinction makes it clear that the doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached.
Perm. Ed. Bd., Commentary no. 10, 1-203 (Feb. 10 1994) (emphasis added).