**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No.   CC-17-1010-STaL |
| JAMES DONZIL ROBERTS, SR. and DEENA WALDMAN ROBERTS, | Bk. No.   1:12-bk-16474-MT |
| Debtors. | Adv. No.  1:12-ap-01371-MT |
| JAMES DONZIL ROBERTS, SR., | |
| Appellant, | |
| v. | **MEMORANDUM**[*] |
| MICHAEL BARNES; CALIFORNIA FARMS INVESTORS LLC, | |
| Appellees. | |

Argued and Submitted on September 29, 2017
at Pasadena, California

Filed – November 13, 2017

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Maureen A. Tighe, Bankruptcy Judge, Presiding

Appearances:    Peter T. Steinberg of Steinberg, Nutter & Brent argued for appellant; Cathrynne Dale argued for appellees

Before: SPRAKER, TAYLOR, and LAFFERTY, Bankruptcy Judges.

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

**INTRODUCTION**

Chapter 7[1] debtor James Donzil Roberts appeals from a judgment excepting from discharge the debt arising from his scheme to defraud Michael Barnes and California Farms Investors LLC (collectively, "Barnes"). Roberts contends that the bankruptcy court committed reversible error by not crediting the value of the farm equipment collateral that secured repayment of Barnes' loan against his damages. According to Roberts, there was no loss caused by his fraud because the value of the collateral was more than sufficient to offset the amount lent.

Roberts' disposition of collateral argument ignores the bankruptcy court's determination that Barnes was forced to assign his interest in the collateral to third party produce suppliers in order to obtain a release of potentially massive liability under the Perishable Agricultural Commodities Act – liability that flowed from Roberts' fraud. Roberts' disposition of collateral argument, furthermore, relies on California Commercial Code statutes enacted to restrict the collection of contract-based debts and attempts to apply them without any supporting authority to a nondischargeable fraud claim.

Most importantly, Roberts admits that he failed to raise the disposition of collateral argument at or before trial. Having not raised this argument in response to the foreclosure of the collateral or in the nondischargeability adversary proceeding,

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

2

Roberts forfeited this argument under clear and longstanding doctrines of appellate process and as a matter of substantive commercial law.

Accordingly, we AFFIRM.

**FACTS**

We primarily rely on the findings of fact set forth in the bankruptcy court's Memorandum Decision. Roberts has not directly challenged any of those findings, and the incomplete record provided by the parties supports the findings made.

Roberts and two other individuals formed a joint venture in 2009 for the stated purpose of producing and selling direct to retail packages containing gourmet organic salads. Roberts and his colleague Daniel Fantz were in charge of soliciting financing. The third joint venturer – Santos Martinez – had extensive farming experience as well as some 450 or so acres of farmland that were to be used to grow at least some of the lettuce varieties needed for the salads. Martinez also agreed to contribute millions of dollars of farming equipment to the joint venture.

The corporate structure of the joint venture was straightforward. Roberts and Fantz formed California Farms, Inc. ("California Farms") which became one of the two members of the joint venture, California Farms II, LLC. The other member was Manjar, Inc. – Martinez's wholly-owned farming business. The joint venture was later renamed California Organics LLC ("Organics").

In October 2009, a third party introduced Roberts and Fantz to Barnes. Roberts and Fantz, through emails, phone calls and

3

in-person meetings made over the next several months, marketed their Organics investment opportunity to Barnes. During the course of that marketing, Roberts and Fantz presented a good deal of information – much of it false or deceptive. As the bankruptcy court later put it, this information included:

> A. a business plan providing "projections" which Defendant did not verify;
> B. misleading "use of proceeds" projections;
> C. false assurances regarding the status of accounts receivable;
> D. false assurances about guaranteed purchase contracts which in fact did not exist.

Mem. Dec. (Sep. 9, 2015) at 3:13-16.

Overall, Roberts represented to Barnes that the joint venture was an ongoing farming business already selling their self-grown organic produce to wholesalers and that a short-term bridge loan would enable the venture to shift their operations into much more lucrative sales to retail grocers like Stater Bros., Albertsons and others - some of whom already were supposedly lined up to buy from the venture.

In reality, the venture was entirely dependent on Martinez' and Manjar's farming expertise, acreage and certified organic growers license to grow the produce they wanted to sell. At the time Roberts began soliciting investment funds from Barnes, however, Manjar had not started growing any produce. In fact, neither Manjar nor the venture ever grew any produce for the venture's business. Martinez and Manjar refused to grow any produce for Organics unless Organics paid Manjar $375,000, which was never paid. Organics either was unable or unwilling to pay that amount in order to grow its own produce.

This was a critical departure from the business model and

4

projections Roberts presented to Barnes in his solicitation materials. The exceptional profits Roberts represented Organics was poised to realize were dependent on self-grown produce sold to retail grocers. Instead, Organics began purchasing produce from third party growers and suppliers and then processed it and resold it – mostly in the wholesale market. These operations effectively enabled Organics to present itself to the investors as a going concern, but they came at a steep cost: the incurrence of massive debt. To make matters worse, unbeknownst to Barnes, Organics' management – including Roberts, Fantz, Martinez and others – paid themselves hundreds of thousands of dollars in draws or "management fees."[2]

Between November 2009 and April 2010, Barnes loaned Organics the aggregate amount of $822,000.[3] The loans were secured by substantial personal property – mostly Manjar's farm equipment. In addition, as one of a number of preconditions to investment, Barnes was named in the venture's amended operating agreement as a "class B manager." We do not specifically know all of Barnes' rights and duties as a class B manager because the parties have not included in their excerpts of record any of the exhibits admitted at trial. But, the trial testimony indicated that Barnes was entitled to routinely receive from the company financial and operating reports and to approve or reject certain

[2] On top of this, Roberts failed to disclose to Barnes that Organics' executive manager – Geoffrey Mousseau – was a convicted felon. Roberts, a licensed attorney, knew that Mousseau's criminal record should have been disclosed to the investors.

[3] Barnes also paid an additional $3,000 as an equity investment in California Organics.

5

transactions. In the event of a loan default Barnes could, and eventually did, assume control of Organics' assets and operations as manager of the joint venture.

The naming of Barnes as a manager, and his rights and duties with respect to Organics' operations, is a key point because his role in the venture potentially exposed him to personal liability to Organics' produce suppliers under the Perishable Agricultural Commodities Act – also known as PACA – 7 U.S.C. § 499a, et seq. Pursuant to PACA, all commission merchants, dealers and brokers of perishable agricultural goods hold those goods (and their proceeds) in trust for the benefit of the vendor of such goods unless and until the vendor is repaid. 7 U.S.C. § 499e(c)(2). Those entities, and their control persons, are liable for any dissipation of the trust's assets under ordinary trust principles. Sunkist Growers v. Fisher, 104 F.3d 280, 282-283 (9th Cir. 1997); see also Nickey Gregory Co., LLC v. AgriCap, LLC, 597 F.3d 591, 595 (4th Cir. 2010) ("[g]eneral trust principles govern PACA trusts unless the principle conflicts with PACA"); Weis-Buy Servs. v. Paglia, 411 F.3d 415, 421 (3d Cir. 2005) ("[i]ndividual liability in the PACA context is not derived from the statutory language, but from common law breach of trust principles"). The record below is devoid of any analysis of either PACA or its application. What is clear, however, is that the unpaid produce suppliers asserted substantial PACA claims against Organics and Barnes individually.

At the time of his investment in Organics, Barnes had no way of knowing of his potential PACA liability because he did not know that Organics was purchasing produce from third party

6

suppliers. To the contrary, Roberts' offering materials and projections created the false impression that all of Organics' produce would be self grown. During the loan funding period, Roberts affirmatively concealed from Barnes that Organics was buying all of its produce from third party suppliers and that Organics was incurring a large amount of PACA debt in the process.

In or around June 2010, after discovering that Organics was accumulating massive debt, Barnes exercised his right under Organics' amended operating agreement to assume control over Organics' operations and assets. We cannot say with any greater precision when, or even whether, Barnes triggered the PACA liability provisions for two reasons. First, the testimony regarding Barnes' assumption of control did not provide a full account of the timing and nature of Barnes' control. Second, the appellate record provided by the parties is gravely incomplete: the parties did not include copies of their trial exhibits for review. Regardless, the unpaid produce suppliers asserted that when Barnes assumed control over Organics he became liable for the company's PACA debts.

Organics eventually failed and a number of PACA creditors sued Organics and Barnes in September 2010. As with the issue of Barnes' control over Organics, the specifics of the PACA lawsuit are unknown. But, the trial record does disclose a handful of critical facts. Namely, the litigation involved hundreds of thousands of dollars in unpaid PACA debt. Additionally, as part of that litigation, the produce suppliers asserted that the equipment collateral securing the debt owed to Barnes was PACA

7

trust property or the proceeds of PACA trust property, and the produce suppliers threatened injunctive relief against Barnes if he attempted to foreclose on the collateral.

Faced with protracted litigation and potential exposure for the alleged mishandling of PACA trust property, Barnes settled with the PACA suppliers by assigning to them his security interest in the equipment collateral.[4] The precise nature of the settlement and the assignment remains unclear given the record provided. However, after the settlement was consummated, the PACA suppliers commenced foreclosure proceedings in which they claimed to be assignees of Barnes' rights under the notes and security agreements that Organics and Manjar executed in favor of Barnes.

The PACA suppliers subsequently foreclosed on the equipment. The record on appeal does not disclose much about the foreclosure either, other than it occurred in 2013. There are a few oblique references to Exhibit 151, which was a copy of the PACA creditors' foreclosure notice. As for the value of the collateral at the time of foreclosure, there is nothing in the record. The limited discussion at trial regarding collateral value varied widely and was not attributed to the relevant time frame of the foreclosure. Moreover, the statements regarding value of the collateral were entirely based on hearsay – the witnesses' recollections of other people's representations

---

[4] Again, the record is unclear whether Organics, Barnes, or both, entered into the settlement or executed the assignment.

8

concerning the collateral's value.[5]

Roberts and his spouse filed a chapter 7 bankruptcy petition, and Barnes thereafter filed an exception to discharge complaint. While Barnes initially sought nondischargeability on multiple grounds, the bankruptcy court after trial ruled in favor of Barnes solely on his § 523(a)(2)(A) claim for relief.

According to the bankruptcy court, the solicitation materials that Roberts presented to Barnes were "replete with misrepresentations," which created the false impression that California Farms (one of Organics' two members) was a going concern when in reality that entity was nothing more than Roberts' and Fantz' prospective plan to sell gourmet organic salads. As the bankruptcy court further explained, Roberts' offering materials concealed that no one at California Farms had any material or relevant farming experience and that it had no operational history with Martinez or Manjar.

The bankruptcy court also pointed to Roberts' misrepresentations regarding California Farms' ability to grow – and experience growing – its own produce. Roberts stated in his offering brochure that "California Farms . . . was a 'Direct Farm - to Volume Retail Sales Model,'" and that it would use "'farming operations and processing equipment' and 'existing growing fields.'" As the bankruptcy court put it:

---

[5] For instance, Barnes testified at trial that Roberts represented to him, at the time of Barnes' investment, that the collateral was worth more than three million dollars. Roberts later seized on this testimony and attempted to argue that it constituted proof of the value of the collateral and proof that Barnes gave the PACA creditors more than $3 million in collateral.

> With reckless disregard, Roberts boasted how Organics LLC could triple revenues, with negligible increase in costs, through redirecting delivery of self-grown lettuce from wholesalers to retailers. Roberts claimed, "we have now successfully established the mechanism to grow, harvest, process, sell and deliver to major market retailers at levels that we believe will be in excess of our own conservative projections."

Mem. Dec. (Sept. 9, 2015) at 10:2-5.

The bankruptcy court also specified that Roberts' deception continued during the entire investment period, from November 2009 through April 2010. During this period, the bankruptcy court noted, Roberts concealed that Organics was not growing any produce, was still primarily selling to wholesalers in three-pound packages and was relying on third party produce vendors who were PACA trust beneficiaries to supply Organics with all produce necessary to maintain operations.[6]

Based on these and other findings, the bankruptcy court concluded that Roberts' scheme to defraud Barnes had resulted in the complete loss of his $825,000 investment: "Plaintiffs' loss of its $825,000 investment in the Venture was actually and proximately caused by Roberts' misrepresentations. . . . But for

---

[6] The following paragraph is representative of the bankruptcy court's findings:

> Roberts also withheld disclosing the PACA orders because he knew that if he sought permission from Plaintiffs to undertake the purchasing from third party growers that Plaintiffs would have learned the true state of affairs of the Venture and would have exercised their remedies, which would have frustrated and prevented the additional funding the Venture was seeking.

Mem. Dec. (Sept. 9, 2015) at 12:1-11.

10

Roberts' misrepresentations, Plaintiffs would not have invested in the Venture and subsequently lost their investment when the Venture could [no] longer pay the PACA creditors it was purchasing from." Mem. Dec. (Sept. 9, 2015) at 14:4-11.

The bankruptcy court entered judgment in favor of Barnes on December 8, 2016. Roberts timely appealed.

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I), and we have jurisdiction under 28 U.S.C. § 158.

**ISSUE**

Did the bankruptcy court err by not crediting the value of the equipment collateral against the $825,000 Barnes invested?

**STANDARDS OF REVIEW**

In nondischargeability appeals, we review the bankruptcy court's findings of fact under the clearly erroneous standard and its conclusions of law de novo. Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009), aff'd, 407 Fed. Appx. 176 (2010).

**DISCUSSION**

Section 523(a)(2)(A) excepts from discharge debts for money, property or services "obtained by false pretenses, a false representation, or actual fraud . . . ." There are five elements bankruptcy courts typically look for in order to conclude that debtor's liability arose from a fraudulent, nondischargeable act. Those elements are:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an

11

intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

Id. at 35 (quoting Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000)).

In his appeal brief, Roberts does not challenge the bankruptcy court's determination that he defrauded Barnes or that Barnes lost $825,000 as a result of his fraud. Rather, he maintains that the bankruptcy court did not credit him for the value of the equipment collateral in calculating Barnes' fraud damages. According to Roberts, there was evidence in the record demonstrating that the collateral was worth millions of dollars. Roberts, therefore, posits that once the value of the collateral is taken into account Barnes really did not suffer any loss. He argues that the bankruptcy court's failure to credit the value of the collateral against the amount of Barnes' damages constitutes reversible error.

Barnes points out Roberts did not raise this argument in the bankruptcy court and contends that he may not raise this argument for the first time on appeal. Roberts concedes that he did not raise the disposition of collateral issue at trial.[7] Rather, he argues that this Panel has the equitable discretion to consider this argument for the first time on appeal.

Before we address the propriety of potentially considering Roberts' application of the collateral argument for the first

---

[7] Roberts never raised the value of the collateral or its disposition, nor any legal argument related to these facts, in his answer, statement of pretrial issues, or closing brief.

12

time on appeal, it is important to note the substantive legal context in which this argument is made. Roberts attempts to invoke commercial law principles governing the recovery of a deficiency judgment for contract-based debts in the context of a nondischargeable fraud claim. He does so without citing any authority that would enable him to insert the square peg of the California Commercial Code into the round hole of nondischargeability litigation for fraud.

Equally important, although Roberts never raised the collateral issue at trial, there was enough evidence generally concerning the collateral that the bankruptcy court did, in fact, take into account both the PACA liability and the foreclosure of the collateral in assessing the consequences of Roberts' fraud. As the bankruptcy court found: "Without Plaintiffs' knowledge or consent, Barnes was exposed to personal liability for [Organics' PACA] debts. . . . Ultimately, Barnes was forced to assign the collateral securing repayment of [his] investment to the PACA creditors in order to settle his liability under the PACA lawsuits." Mem. Dec. (Sept. 9, 2015) at 4:10-13. In other words, Barnes "lost" the collateral when it was used to satisfy the PACA related damages that also flowed from Roberts' fraud. Roberts simply ignores this finding and its consequences in making his collateral argument.

We decline to dwell on the above-referenced deficiencies in Roberts' argument. There is a simpler response to his argument: neither sound doctrines of appellate process nor substantive commercial law permit us to consider Roberts' application of the collateral argument for the first time on appeal. We explain why

13

below.

We start with the unremarkable proposition that issues not raised before appeal ordinarily are forfeited on appeal. Scovis v. Henrichsen (In re Scovis), 249 F.3d 975, 984 (9th Cir. 2001). Absent exceptional circumstances, the appellate court can refuse to consider them. Id.; El Paso City of Tex. v. Am. W. Airlines, Inc. (In re Am. W. Airlines), 217 F.3d 1161, 1165 (9th Cir. 2000).

The Ninth Circuit Court of Appeals has recognized the following as exceptional circumstances that may permit the appellate court to consider an issue for the first time on appeal:

> (1) when review is required to "prevent a miscarriage of justice or to preserve the integrity of the judicial process," (2) "when a new issue arises while appeal is pending because of a change in the law," and (3) "when the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed."

Mano-Y & M, Ltd. v. Field (In re Mortg. Store, Inc.), 773 F.3d 990, 998 (9th Cir. 2014) (quoting In re Mercury Interactive Corp. Sec. Litig., 618 F.3d 988, 992 (9th Cir. 2010)).

Roberts has not presented anything on appeal that suggests his failure to raise the collateral issue at trial has resulted in a miscarriage of justice. Nor has he established that the disposition of collateral issue arose from a change in the law. Finally and most importantly, the disposition of collateral issue is decidedly not an issue of law but is closely tied to the

14

facts.[8]  The record was never developed to address this factual issue because Roberts failed to raise it.

Even if well settled principles of appellate procedure did not prevent Roberts from raising the disposition of collateral argument for the first time on appeal, the substantive commercial law he relies upon does.  The sole legal basis now advanced by Roberts in support of his disposition of collateral argument is premised on California Commercial Code section 9626.  Generally speaking, this provision governs a creditor's right to a deficiency judgment and incorporates the requirement that secured creditors dispose of their collateral in a commercially reasonable manner.  California Commercial Code section 9610(b) requires secured creditors to dispose of collateral in a commercially reasonable manner.[9]  In turn, California Commercial Code section 9626(a)(3) provides:

> (3) Except as otherwise provided in Section 9628, if a secured party fails to prove that the collection, enforcement, disposition, or acceptance was conducted in accordance with the provisions of this chapter relating to collection, enforcement, disposition, or acceptance, the liability of a debtor or a secondary obligor for a deficiency is limited to an amount by which the sum of the secured obligation, expenses, and attorney's fees exceeds the greater of either of the following:

---

[8] The factual nature of Roberts' sole argument on appeal is further discussed below.

[9] That commercial code provision states:

> (b) Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable.  If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

15

(A) The proceeds of the collection, enforcement, disposition, or acceptance.

(B) The amount of proceeds that would have been realized had the noncomplying secured party proceeded in accordance with the provisions of this chapter relating to collection, enforcement, disposition, or acceptance.

Roberts now seeks to reduce his liability to Barnes by citing California Commercial Code section 9626(a)(3) and by alleging that he failed to dispose of the collateral in a commercially reasonable manner.

Roberts bases his argument upon the California Commercial Code. However, Barnes has recovered damages for fraud, not a deficiency judgment for breach of a secured contractual obligation. Even if the court were to apply the commercial reasonableness requirement set forth in California Commercial Code section 9626(a)(3), additional issues abound. Roberts' argument implicitly assumes that: (1) the assignment of the collateral to the PACA creditors constituted a disposition of collateral, (2) such disposition was not commercially reasonable, and (3) the judgment entered by the bankruptcy court constituted a "deficiency judgment" under California's Commercial Code. Roberts fails to address these matters in any detail, saying only that the bankruptcy court failed to credit the value of the collateral against his liability.

It is far from clear whether the Commercial Code would treat the subject assignment as a disposition of collateral (or treat the nondischargeability judgment as a deficiency judgment). The Commercial Code indicates that some – but not all – assignments qualify as dispositions of collateral. See generally Cal. Com.

16

Code §§ 9406(e), 9618(b)(1). Case law confirms that not all assignments of security interests constitute dispositions of collateral that could result in a deficiency or surplus. See, e.g., Lee & Mason Int'l Agency, Inc. v Daugherty, 828 S.W.2d 677, 679 (Ky. App. 1992); Reeves v. Assocs. Fin. Servs. Co., 247 N.W.2d 434, 439 (Neb. 1976); but see also Charles E. Brauer Co. v. NationsBank of Virginia, N.A., 251 Va. 28, 34 (Va. 1996) ("[t]he term 'disposition' is not defined in the U.C.C., but the language of [the predecessor to section 9610(a) and (b)] indicates that it means an actual transfer of an interest in the collateral by sale, lease, or contract").

We need not decide whether the assignment at issue herein qualified as a disposition of collateral. Even if the assignment were a disposition resulting in a deficiency, Roberts is precluded by substantive commercial law from arguing for the first time on appeal that the assignment was commercially unreasonable. Section 9626(a) of the California Commercial Code provides:

(a) In an action arising from a transaction, other than a consumer transaction, in which the amount of a deficiency or surplus is in issue, the following rules apply:

**(1) A secured party need not prove compliance with the provisions of this chapter relating to collection, enforcement, disposition, or acceptance unless the debtor or a secondary obligor places the secured party's compliance in issue.**

(2) If the secured party's compliance is placed in issue, the secured party has the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with this chapter.

(Emphasis added.)

17

As the Assembly Committee Comment accompanying the statute explains, a debtor seeking to block a deficiency judgment must raise the issue of noncompliance with the Commercial Code (i.e., the failure to act in a commercially reasonable manner) "in accordance with the forum's rules of pleading and practice." Id. If the debtor fails to do so, then "the secured party need not prove compliance with the relevant provisions" of the Commercial Code. Id. In short, Barnes was under no duty to prove that his conduct was commercially reasonable – and the bankruptcy court was not obliged to make any sort of commercial reasonableness finding – when Roberts never raised the issue.

Requiring the obligor to raise the disposition of collateral issue makes eminent sense. Commercial reasonableness is an inherently factual issue whose resolution typically depends on all of the particularized circumstances of each individual case. Ford & Vlahos v. ITT Commercial Fin. Corp., 8 Cal. 4th 1220, 1235 (1994); Crosby v. Reed (In re Crosby), 176 B.R. 189, 195 (9th Cir. BAP 1994), aff'd, 85 F.3d 634 (9th Cir. 1996); see also In re El Camino Charter Lines, Inc., 2012 WL 1514815, *2 (Bankr. N.D. Cal. Apr. 27, 2012). When, as here, the debtor did not properly raise the commercial reasonableness issue before trial, the secured creditor is denied an opportunity to adequately prepare and present evidence on the issue. A trial court attempting to address the issue that has not been properly raised or developed would be left to speculate whether all of the relevant circumstances concerning reasonableness have been disclosed.

This Panel cannot consider Roberts' disposition of

18

collateral argument for the first time on appeal. The governing commercial statute relied upon by Roberts, as well as sound appellate practice, dictate this result. Given that Roberts has not raised any other issues on appeal, we AFFIRM.

## CONCLUSION

For the reasons set forth above, we AFFIRM the bankruptcy court's nondischargeability judgment.