COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Beales, Friedman and Callins
Argued at Richmond, Virginia


MONTALLA, LLC

                                                    MEMORANDUM OPINION* BY
v.        Record No.  0127-22-2                      JUDGE FRANK K. FRIEDMAN
                                                           APRIL 25, 2023
COMMONWEALTH OF VIRGINIA,
 VIRGINIA DEPARTMENT OF TRANSPORTATION
 AND THE COMPTROLLER OF VIRGINIA


                FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                          T. J. Markow, Judge Designate

            Thomas A. Coulter (Brian Stolarz; Norton Rose Fulbright US LLP,
            on briefs), for appellant.

            Jeremy D. Capps (David P. Corrigan; Blaire H. O'Brien; Harmon,
            Claytor, Corrigan & Wellman, on brief), for appellee.


        This appeal involves the assignment of settled claims and the reach of sovereign immunity.

NXL, Inc. entered a series of contracts with the Commonwealth which spawned significant

disputes.  NXL, Inc. ultimately settled these disputes, via mediation, but then assigned its interests

to Montalla, LLC, another construction management company.  Montalla pursued claims against the

Commonwealth based on NXL's underlying contracts.  Montalla now appeals the circuit court's

decision sustaining the Commonwealth's plea in bar of sovereign immunity.  Additionally,

Montalla challenges several related rulings denying its motion to reconsider and declining to grant

Montalla's motion to amend its pleading.  Montalla makes a compelling argument that its assignor,

_____
        * This opinion is not designated for publication.  *See* Code § 17.1-413,

NXL, was wronged by the Commonwealth; but governing precedent requires us to affirm the judgment of the circuit court, denying Montalla the relief it seeks.

## BACKGROUND[1]

The Virginia Department of Transportation ("VDOT") manages an annual budget of more than $7 billion. In order to better meet its obligations, VDOT established an Assurance and Compliance Office ("ACO"). The ACO was charged with conducting internal reviews and investigations regarding VDOT's spending and charges. To aid in analyzing these expenses, ACO required consultants and contractors to submit audit reports, which allowed ACO to check compliance with Federal Acquisition Regulation ("FAR") overhead rates. Disputes between NXL, Inc. ("NXL" or "the Company") and VDOT began after ACO implemented enhanced scrutiny of the contractor's FAR compliance audits.

Federal law requires that any contract or subcontract awarded for engineering and design services by state transportation departments be performed and audited in compliance with the cost principles outlined in FAR. *See* 23 U.S.C. § 112(b)(2)(B); 23 CFR § 172.11. These FAR cost principles allow contractors to be reimbursed from VDOT for their indirect overhead. It follows that consulting firms—like NXL—who contract with VDOT are required to submit an indirect rate audit report for each fiscal year. When the annual audits do not provide sufficient information to justify the reimbursement rates that have been requested, federal regulations permit state transportation departments to dispute the indirect cost reimbursement rates cited by the contractor. *See* 48 § CFR 31.201-2(d).

NXL's disputes with VDOT centered around three VDOT consulting contracts that NXL won in 2014. In May 2014, NXL agreed to provide engineering services for the Northern Virginia

---

[1] When the circuit court decides a case on a demurrer and special plea as it did here, "we consider the facts stated and all those reasonably and fairly implied in the light most favorable to the nonmoving part[y]." *Kaltman v. All Am. Pest Control, Inc.*, 281 Va. 483, 486 (2011).

District (the "Northern Virginia Contract"). The contract stated that it was a fixed billable contract and that the total maximum compensation would not exceed $5 million. The contract also provided that the contractor is to receive reimbursement for direct costs, as well as a percentage of the indirect costs. This contract included a costs section specifying that the consultant must submit an invoice that "shall include all work completed during the invoice period. Such invoice shall also include all materials, salaries, rentals, travel expenses, profit, field and office equipment, supplies and any other items utilized to complete the work." Later in 2014, NXL and VDOT would execute two very similar agreements to serve the Lynchburg (the Lynchburg Contract) and Hampton Roads areas (the Hampton Roads Contract).

### The FAR Rate Issue

When Virginia companies submit the required FAR audit, the firm's indirect overhead costs may be reimbursed, and this is what becomes known as the FAR rate. VDOT then reviews and approves the FAR rates which were derived from the audits. In 2014, after the Company won the Northern Virginia, Lynchburg, and Hampton Roads VDOT Contracts as prime consultants, NXL used FAR rates to calculate the fixed billable hourly rates under these contracts. These rates were approved by VDOT. VDOT subsequently created the ACO, which was assigned responsibilities including the FAR audit process. In 2015, ACO demanded that NXL resubmit previously approved FAR audits because they did not meet the standards of the FAR regulations, in ACO's opinion.

### The Dispute Regarding the 2014 Contracts

At the heart of the disagreement over FAR rates between VDOT and NXL was ACO's argument that the Company was being overcompensated for services due to high overhead rates and improper "lease payments of vehicles used by its construction inspectors." Essentially, ACO conducted VDOT's review and believed that NXL was overbilling for the cost of vehicles which

were being leased.[2]  VDOT treated vehicle lease costs as direct expenses that were meant to be paid/repaid to the Company.  ACO believed that the vehicle lease rates did not comply with FAR, as required by federal law and outlined in each of the 2014 contracts.  The Company insisted that ACO was selectively misinterpreting FAR to VDOT's benefit and to the detriment of the company.[3]

<u>VDOT Unilaterally Cuts Montalla's Overhead Rates</u>

Around July 2016, VDOT's ACO Director, Bradley W. Gales, sent a letter to NXL officially rejecting its overhead rate based on a FAR audit.  However, Gales did not indicate what would have been the proper rate for the Company to use.  Shortly after, Jeffrey R. Allen, the Senior Assistant Attorney General with the Office of the Attorney General ("OAG") contacted the Company's attorney and informed the Company that it was not entitled to bill for any overhead and that the overhead rate which used to be 128.8% to 137.94% in the contracts was now 0%.  VDOT stated if the Company did not comply, it would consider terminating all its contracts with the Company.

In March 2017, ACO provided contingent approval of the Company's 2014-2015 audits, allowing a 75% provisional overhead rate, which was still far below VDOT's earlier approved rate.  Shortly after, the Company claimed it began losing an immense amount of money.  NXL alleged that it lost money for every hour it billed.  The more hours its employees worked, the

---

[2] VDOT explains in its brief that "NXL billed VDOT for the cost of vehicles leased from a company owned by a family member of its chief executive officer, but only provided documentation sufficient for leases from an independent third party billed at a market rate."  In other words, VDOT suspected NXL was charging based on a market rate which was higher than NXL's actual cost.

[3] Evidence would show that there was a rift within VDOT at this time, with ACO insisting upon lower lease rates, while VDOT officials believed NXL was entitled to the higher rates that had been negotiated.  To neutralize ACO's efforts to rewrite VDOT's position on FAR rates, VDOT began drafting the first Instructional Informational Memorandum ("IIM"), which would have validated the Company's position and its right to continue to bill and be reimbursed per its existing contract FAR rates.  While this internal disagreement played out, ACO officials imposed their reading of the rate rules on NXL.

more money the company was losing. This not only affected the Company's prime contracts but also had an impact on every VDOT contract where the Company worked as a subconsultant. There was never any official action to modify the Company's contracts and have them reflect the 0% and 75% change rates; instead, the ACO was simply rejecting the Company's contract terms for payment of much higher pre-approved FAR rates. VDOT did eventually allow NXL to resume charging FAR overhead rates beginning in September 2017. At this time ACO approved a set of reimbursement rates, 91.01% and 99.13%, which were above the arbitrary provisional rates, but still significantly below the rates of 137.94% and 128.28% which had been previously agreed upon contractually.

<u>The Company Agrees to Mediation—and Successfully Mediates the Dispute to a Resolution and Voluntarily Pays the Negotiated Sums</u>

Without pre-approved FAR rate reimbursements, the Company was suffering financially. It agreed to try to resolve its dispute with VDOT through mediation. During the mediation, VDOT argued in favor of ACO's position on FAR reimbursement. However, just a month before the mediation, the VDOT Commissioner, with the support of the OAG, approved VDOT's official correspondence to the Federal Highway Administration which recognized that ACO's criticism of NXL's rates was likely improper. This was not revealed to NXL during the mediation negotiations. Ultimately, because of their severe financial loss, the Company acceded to a mediated settlement agreement in which it would "refund" VDOT $4 million for prior billings.

The parties also agreed to mutual releases, covenants, and conditions. Specifically, NXL agreed to release VDOT from all claims associated with the specified disputes, "whether asserted or could have been asserted" against VDOT arising out of the dispute "including, but not limited to, the withholding of approximately Two Million Eight Hundred Thousand Dollars ($2,800,000.00) NXL claimed VDOT wrongfully withheld when VDOT withheld indirect overhead costs in 2016 and 2017." In return, VDOT agreed to release NXL from all claims related to FAR indirect cost

overhead audits, direct cost audits, and other related audits of payments and reimbursements that VDOT alleged constituted overbillings by NXL. Furthermore, the Company was not allowed to recover amounts VDOT prevented it from billing. The parties never officially modified any of the relevant 2014 contracts.

### The Company Contends that Economic Duress Caused it to Sign the Settlement Agreement

Appellant asserts that NXL only participated in the mediation and consented to the settlement agreement because of economic duress caused by VDOT. Appellant contends that NXL could either go along with the agreement or become bankrupt. The settlement agreement included a provision accommodating for financial difficulties and allowed NXL to pay the $4 million over a span of four years. NXL, however, elected to pay VDOT $3.875 million promptly, which VDOT agreed to accept as full payment of the debt since it was paid early.

### IIM Background and Events Following the Mediation

As noted above, VDOT wrestled internally regarding the proper analysis of FAR overhead and vehicle charges in 2016-17. VDOT began drafting its first IIM in order to neutralize ACO's efforts to rewrite VDOT's position on FAR rates. The IIM was meant to validate NXL's position and its right to continue to bill and be reimbursed per its existing contract FAR rates. In July 2016, there was an IIM prepared which would have allowed the Company's requested reimbursements. At the same time, ACO endeavored to change the existing VDOT policy regarding the FAR rate reimbursement and rescind the July 2016 IIM. ACO, after successfully quashing the 2016 IIM, quickly moved to impose the debilitating 0% reimbursement rate on the Company. After the 2016 IIM was rescinded, VDOT embarked immediately on a new IIM in an effort to formally overrule the ACO, resulting in the 2017 IIM, which supported the Company's position regarding its charges.

A few months after the mediation—which was held October 10, 2017—but weeks before the settlement agreement was finalized, VDOT issued an IIM on December 20, 2017. The IIM

described how VDOT is going to pay consultants for vehicle leases/rentals used on construction inspection projects. The IIM allowed companies to be reimbursed a fixed monthly rate for vehicles regardless of ownership or types of leases. Put another way, less than two months after the mediation session between VDOT and the Company, where VDOT insisted that the Company owed VDOT substantial amounts of money due to overpayment for leased vehicles, VDOT implemented a vehicle reimbursement plan that allowed a fixed reimbursement rate for construction inspection vehicles to consultants regardless of who owns the vehicle and regardless of the type of lease involved—this was the very position NXL had advocated during its dispute with VDOT.

Appellant alleges that NXL learned of the 2017 IIM on January 11, 2018, after it had agreed to the mediation settlement terms, but before the settlement agreement became enforceable by the Governor's approval on February 20, 2018. Appellant argues that the 2017 IIM represented a change in VDOT's approach to reimbursement for vehicle overhead costs from what VDOT had presented during the October mediation with NXL. Appellant also points out that the VDOT Commissioner attended the mediation session and that the Commissioner was the one to approve the IIM prior to the mediation. When NXL learned of the IIM, it engaged in efforts to have the settlement agreement modified. The Company met with the VDOT Commissioner and sent a follow up letter to the Commissioner in 2018 expressing its concerns "regarding VDOT's conduct toward the company." The Company eventually filed a FOIA request. In response, VDOT ultimately provided substantive information which revealed details about the internal war between VDOT's Chief Engineer and the ACO regarding the interpretation of FAR for vehicle lease payments. Notably, the Company learned that VDOT was ready to proclaim its official position as early as March 2017, in full alignment with the Company, that vehicle lease rates were fully reimbursable, regardless of the ownership issues raised by ACO. In the interim, however, ACO imposed its auditing will on NXL, leading to the challenged mediation.

- 7 -

<u>Assignment of NXL's Claims to Montalla</u>

After January 3, 2019, NXL changed its name to Contana, Inc. ("Contana"). On December 28, 2019, Contana assigned its rights related to the settlement agreement along with the underlying contracts which were part of that settlement agreement to Montalla. Montalla then filed suit in the Circuit Court of the City of Richmond seeking to void the settlement agreement and proceed on claims of breach of contract. Montalla sought a declaratory judgment that the settlement agreement was "null and void based upon economic duress" (count one). Montalla also asked the circuit court to vacate the settlement agreement under Code § 8.01-581.26 which permits the voiding of a mediation for fraud or other improprieties (count two). Montalla next asserted a breach of contract based on "breach of the implied duty of good faith and fair dealing" (count three). Finally, Montalla alleged material breaches of Montalla's underlying contracts with VDOT (count four) and an "unconstitutional regulatory taking of [its] property without just compensation" (count five).

<u>Demurrer and Appeal</u>

VDOT filed a demurrer and pleas in bar and briefs in support. VDOT's pleas in bar asserted accord and satisfaction, expiration of the statute of limitations, and sovereign immunity. On September 13, 2021, the circuit court heard oral argument on the demurrer and pleas in bar. At the hearing, the circuit court held that the complaint sufficiently pled facts to establish a claim of economic duress and overruled VDOT's Demurrer on that issue. The circuit court granted VDOT's plea in bar regarding sovereign immunity as to counts one (seeking declaratory judgment that settlement is null and void) and two (seeking to have mediated settlement vacated under Code § 8.01-581.26). The circuit court declined to dismiss the remaining counts on the basis of sovereign immunity. The following day, however, the circuit court issued a letter stating "[h]aving reconsidered my ruling of September 13, 2021, I sustain the defendant's plea of sovereign immunity and because of that ruling the entire case must be dismissed."

The circuit court memorialized its decision in a written order dated January 4, 2022, sustaining VDOT's plea in bar of sovereign immunity and dismissing Montalla's complaint with prejudice. The circuit court denied Montalla's motion for reconsideration and request for leave to amend its complaint. This appeal followed.

ANALYSIS

In multiple assignments of error, Montalla presents five arguments. First, Montalla asserts that the circuit court erred in sustaining VDOT'S plea in bar of sovereign immunity and by dismissing Counts I-III; these counts involved attempts to void the settlement agreement (Count I), void the mediation (Count II), and to challenge VDOT's actions as a breach of the implied duty of good faith and fair dealing (Count III). Next, Montalla claims that the circuit court erred by dismissing Counts IV and V, which challenged VDOT's alleged breaches of the underlying 2014 contracts (Count IV) and VDOT's "unlawful taking" of the Company's contractual proceeds (Count V). Montalla additionally contends that the circuit court erred by withdrawing, without explanation, its initial September 13, 2021 oral ruling, which overruled VDOT's demurrer in part. Finally, Montalla claims that the circuit court erred by denying its motion for reconsideration and by failing to permit its request for leave to amend. We address each argument in turn.

I. The Plea in Bar was Properly Sustained as to Counts I-III

"A plea in bar asserts a single issue, which, if proved, creates a bar to a plaintiff's recovery." *Kinsey v. Va. Elec. & Power Co.*, 300 Va. 124, 131 (2021) (quoting *Massenburg v. City of Petersburg*, 298 Va. 212, 216 (2019)). "[W]here a plea in bar presents a question of law and there are no disputed facts relevant to the issue, we review the circuit court's decision to sustain the plea in bar de novo." *Bragg Hill Corp. v. City of Fredericksburg*, 297 Va. 566, 577 (2019).

Montalla contends that the circuit court erred in sustaining VDOT's plea in bar of sovereign immunity to Counts I-III. Regarding Count I, Montalla argues that sovereign immunity does not

apply to actions based on valid contracts entered into by duly authorized government agents. Regarding Count II, Montalla argues that the Commonwealth agreed to participate in the mediation and therefore is not able to invoke sovereign immunity to now shield itself from claims based on laws which govern mediations. Finally, Montalla argues that Count III concerns contracts between the parties, and therefore sovereign immunity is not applicable. Each argument fails.

### A. Count I: Sovereign Immunity Applies to Equitable Claims Such as Rescission of a Contract

Montalla argues that sovereign immunity does not apply to valid contracts entered into by the Commonwealth. It contends that the settlement agreement should be void based on economic duress and, because Count I is contract based, sovereign immunity cannot shield VDOT from liability. The Commonwealth counters that sovereign immunity is alive and well in the Commonwealth of Virginia, *Messina v. Burden*, 228 Va. 301, 307 (1984), and "[a]s a general rule, the Commonwealth is immune both from actions at law for damages and from suits in equity to restrain governmental action or to compel such action." *Afzall ex rel. Afzall v. Commonwealth*, 273 Va. 226, 231 (2007) (quoting *All. to Save the Mattaponi v. Commonwealth*, 270 Va. 423, 455 (2005)). The Commonwealth further notes that sovereign immunity serves "a multitude of purposes" including protecting the public purse, and providing for the smooth operation of government. *Id.*[4] Those purposes are furthered by applying sovereign immunity to VDOT. *See Main v. Dep't of Highways*, 206 Va. 143, 150-51 (1965).

Montalla correctly asserts that sovereign immunity does not bar actions to enforce a valid contract entered into by an authorized agent of the Commonwealth. *See Wiecking v. Allied Med. Supply Corp.*, 239 Va. 548, 552-53 (1990) (seeking to enforce contract). However, voiding a

---

[4] The sovereign immunity enjoyed by the Commonwealth extends to its agencies, as well as their officers. *See Rector & Visitors of the Univ. of Va. v. Carter*, 267 Va. 242, 244 (2004); *see also All. to Save the Mattapoini*, 270 Va. at 455 ("[H]igh-level governmental officials generally have been afforded absolute immunity.").

contract is not the same as enforcing one. Here, Montalla is not seeking simply to hold the "sovereign . . . liable for its contractual debts as any citizen would be . . . ." *Id.* at 553. Instead, it seeks to have the settlement agreement adjudicated as void. It is essentially arguing that the parties should be returned to their status quo. "If rescission is granted, the contract is terminated for all purposes, and the parties are restored to the status quo ante." *Young-Allen v. Bank of America, N.A.*, 298 Va. 462, 468 (2020). This would have the effect of equitable recission. "[T]he aim of equity is to award complete, just and equitable relief, with a view to restoring the parties to the status quo and equitably adjusting their interests under the circumstances of the case." *Devine v. Buki*, 289 Va. 162, 173 (2015) (citing *Newton v. Newton*, 199 Va. 654, 660 (1958)).

As the Supreme Court observed in *Afzall*, the Commonwealth generally is immune "from suits in equity . . . ." *Afzall*, 273 Va. at 231. Similarly, the Commonwealth is immune from liability for damages and from suits to restrain governmental action or to compel such action. *See Ligon v. Cnty. of Goochland*, 279 Va. 312, 316 (2010); *see also Daniels v. Mobley*, 285 Va. 402 (2013) (holding that to the extent plaintiff had requested a declaration of his rights, such declaration would be barred by sovereign immunity).

Montalla's effort to obtain a declaratory judgment that the settlement agreement is null and void, and seeking to compel VDOT to return all amounts paid under the settlement agreement is a request for equitable relief dressed in breach of contract clothing. *See Denton v. Browntown Valley Assocs., Inc.*, 294 Va. 76, 82 (2017) (specific performance is an equitable remedy and a suit in equity for specific performance is distinct from an action at law for breach of contract).[5]

---

[5] Moreover, in the context of construction claims against VDOT, the Commonwealth has only waived its sovereign immunity through mandatory procedures contained in Code § 33.2-1101. We discern no indication that the Commonwealth has abrogated its immunity from equitable claims seeking to rescind or void a settlement agreement related to construction claims.

In short, numerous cases confirm that the Commonwealth is immune to suits in equity. *See Azfall*, 273 Va. at 231; *All. To Save the Mattaponi*, 270 Va.at 423; *Hinchey v. Ogden*, 226 Va. 234, 239 (1983). Because we find that sovereign immunity applies in this context, and because the Commonwealth has not waived sovereign immunity in this setting, the circuit court properly ruled that the Commonwealth enjoys sovereign immunity with respect to Count I's attempt to "void the Settlement Agreement."[6]

### B. Count II: Sovereign Immunity Was Not Explicitly Waived by the Commonwealth Under Code § 8.01-581.26

Next, Montalla argues that Code § 8.01-581.26 "permits a Court to vacate a mediated agreement, or vacate an order from a mediation, when the agreement was 'procured by fraud or duress, or is unconscionable.'" Montalla states that "[t]he Commonwealth expressly permitted its agencies to engage in mediation and Chapter 21.2 of Title 8.01 governs all mediations in Virginia." Therefore, Montalla reasons that the Commonwealth cannot agree to mediation and at the same time shield itself from what arises from its participation.

Montalla asserts "that the Commonwealth implicitly waived its immunity by authorizing public bodies to engage in alternative dispute resolution, including mediation, through Virginia Code § 2.2-4366." However, Montalla's "implicit waiver" claim is decidedly uphill because it is well-settled that waivers of sovereign immunity "must be explicitly and expressly announced." *Afzall*, 273 Va. at 230. Indeed, any waiver the General Assembly makes of the Commonwealth's

---

[6] The Supreme Court has also made it abundantly clear that quasi-contract claims cannot be maintained against the Commonwealth. *See Wiecking*, 239 Va. at 551-52 (holding: (1) quasi-contractual doctrines are premised on the *absence* of a valid contract; (2) the Commonwealth's common law liability for its contracts does not encompass quasi-contractual claims; and (3) any relief based on such claims must be authorized through a statute abrogating the Commonwealth's sovereign immunity). Similarly, this Court in *XL Specialty Ins. Co. v. Commonwealth, Dep't of Transp.*, 47 Va. App. 424, 433-34 (2006), recognized this principle, noting that courts have not extended the Commonwealth's waiver of sovereign immunity for contractual suits to equitable remedies absent an explicit statutory waiver.

sovereign immunity will be strictly construed, as it is a statute in derogation of the common law. *See Rector & Visitors of the Univ. of Va. v. Carter*, 267 Va. 242, 245 (2004). Here, Code § 8.01-581.26 does not expressly abrogate the Commonwealth's immunity from suit. The fact that a public body simply participates in a mediation does not equate to an explicit waiver of sovereign immunity related to claims arising out of that mediation. A waiver of sovereign immunity cannot be implied from general statutory language. *Ligon*, 279 Va. at 318.

In *Afzall*, the question was whether Code § 8.01-66.9 "evinces an intention on the part of the General Assembly to waive sovereign immunity so as to permit a party to seek judicial review by way of a motion for declaratory judgment of action taken pursuant to that Code section." 273 Va. at 233. The Commonwealth in *Afzall* noted that Code § 8.01-66.9 "makes it clear that when the General Assembly intends to waive sovereign immunity and provide a particular procedure for an injured person to follow in seeking judicial review, it knows how to demonstrate that intention." *Id.* at 233-34. The Supreme Court found that sovereign immunity applied in *Afzall* because the Commonwealth had not waived the defense. *Id.*

Code § 8.01-581.26, relied upon here by Montalla, states:

> Upon the filing of an independent action by a party,[7] the court shall vacate a mediated agreement reached in a mediation pursuant to this chapter, or vacate an order incorporating or resulting from such agreement, where:
>
> 1. The agreement was procured by fraud or duress, or is unconscionable;
>
> 2. If property or financial matters in domestic relations cases involving divorce, property, support or the welfare of a child are in dispute, the parties failed to provide substantial full disclosure of all relevant property and financial information; or

---

[7] Montalla was not a literal "party" to the mediation. It was assigned the claims by NXL. Neither side has briefed whether Montalla qualifies as a party under this statute. We assume without deciding that it is a party for the purposes of this analysis.

- 13 -

3. There was evident partiality or misconduct by the mediator, prejudicing the rights of any party.

For purposes of this section, "misconduct" includes failure of the mediator to inform the parties at the commencement of the mediation process that: (i) the mediator does not provide legal advice, (ii) any mediated agreement may affect the legal rights of the parties, (iii) each party to the mediation has the opportunity to consult with independent legal counsel at any time and is encouraged to do so, and (iv) each party to the mediation should have any draft agreement reviewed by independent counsel prior to signing the agreement.

The code section sets forth the conditions under which mediations can be vacated including fraud or duress, failure to provide proper financial information, or where there was misconduct by the mediator. There is no language whatsoever within the section that expressly or explicitly states a waiver of sovereign immunity. In the absence of such an express waiver, sovereign immunity cannot be deemed to have been waived under Code § 8.01-581.26—and the Commonwealth, accordingly, enjoys the protection of sovereign immunity. *See Azfall*, 273 Va. at 230-31.

C. Count III: Montalla's Reliance on the Duty of Good Faith and Fair Dealing Claim Does Not Prevail Here Where the Challenged Disputes Have Been Fully Settled and Where they Involve Allegations of Improper Conduct in Negotiating the Settlement at the Mediation

Montalla argues that VDOT breached the covenant of good faith and fair dealing by "reducing contract reimbursement to 0% for eight months and then increasing it to 75%, which was still below contract rates, all under a flawed FAR interpretation." Furthermore, when NXL attempted to mediate in good faith, Montalla contends that VDOT and OAG continued to breach the covenant of good faith and fair dealing by making misleading statements during the settlement negotiations and ultimately leading NXL to accept the mediated agreement under duress.

Montalla next argues that the United States Court of Appeals for the Fourth Circuit has called the duty of good faith and fair dealing a "fundamental premise of contract law," and has held that "it is a basic principle of contract law in Virginia, as elsewhere that . . . a party may not exercise

- 14 -

contractual discretion in bad faith, even when such discretion is vested solely in that party."

*Virginia Vermiculite, Ltd. v. Peers*, 156 F.3d 535, 542 (4th Cir. 1998).  Montalla also notes that

various courts have stated that the "need for mutual fair dealing" is "no less required in contracts to

which the government is a party."  *North Star Alaska Housing Corp. v. United States*, 76 Fed. Cl.

158, 187 (Fed. Cl. 2007); *see also United States v. Centex Corp.*, 395 F.3d 1283, 1304 (Fed. Cir.

2005).

Again, while Montalla makes a compelling argument that NXL was ill-treated by VDOT,

the law does not offer appellant relief under these unique facts.[8]  If appellant is seeking to recover

damages based on a theory of good faith and fair dealing regarding the underlying 2014 contracts,

those claims were conclusively resolved through the settlement agreement.  Specifically, NXL

agreed that

> VDOT shall be released, acquitted and forever discharged, from
> any and all past, present and future actions, claims, debts,
> demands, damages, actions, causes of action, costs, expenses,
> compensation, third party actions, and/or liability, whether known
> or unknown, whether at law or in equity, whether asserted or could
> have been asserted which NXL may have or might claim against
> VDOT arising out of or relating to the Disputes, including, but not
> limited to, the withholding of approximately Two Million Eight
> Hundred Thousand Dollars ($2,800,000.00) NXL claimed VDOT
> wrongfully withheld when VDOT withheld indirect overhead costs
> in 2016 and 2017.

Thus, appellant finds itself in a legal conundrum: in attempting to proceed on "good faith"

claims with respect to the underlying 2014 contract claims, its assignor has settled and released the

claims.  *See, e.g.*, *Erie Ins. Co. v. McKinley Chiropractic Ctr.*, 294 Va. 138, 139 (2017) (holding an

assignee of a chose in action was barred from suit against a defendant when the assignor had

---

[8] To the extent appellant is seeking to void the settlement agreement due to claims that the Commonwealth does not enjoy sovereign immunity in this context, the same reasoning as applied in previous sections governs.  The Commonwealth is entitled to rely upon sovereign immunity with respect to equitable claims, quasi-contract claims, and alleged misconduct under Code § 8.01-581.26.

- 15 -

released his claims in a settlement agreement with defendant).  The settlement agreement releasing the assigned claims remains in full force. [9]

By contrast, if Montalla is claiming that the mediation negotiation itself constituted a violation of the duty of good faith and fair dealing, the Company faces another significant roadblock.[10]  Montalla relies on the *Restatement (Second) of Contracts* § 205 to establish that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."  But the comments to the Restatement undercut Montalla's assertion that the covenant applies to contract *negotiation*: § 205 "does not deal with good faith in the formation of a contract.  Bad faith in negotiation, although not within the scope of this Section, may be subject to sanctions."  *Id.* cmt. c.

Virginia law on this subject is not robust; however, it is consistent with the Restatement.  The covenant of good faith and fair dealing is an implied duty that each party to a contract owes to its contracting partner; it imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable

---

[9] Moreover, the record reflects that NXL elected to make "early" payment of the negotiated sum due.  It did so with knowledge that VDOT had negotiated the dubious ACO overhead theory at the mediation despite VDOT's awareness that it imminently planned to jettison this overhead calculation theory under the 2017 IIM.  In fact, NXL protested this very fact to VDOT's Commissioner before making payment.  While we need not reach the issue of voluntary payment given the posture of the pleadings, our Supreme Court has consistently held that "[v]oluntary payment of a judgment deprives the payor of the right of the appeal." *Citizens Bank & Tr. Co. v. Crewe Factory Sales Corp.*, 254 Va. 355, 355 (1997); *see D.R. Horton, Inc. v. Board of Supervisors for Cnty. of Warren*, 285 Va. 467, 472 (2013) (noting the voluntary payment doctrine prevents a party from recovering funds paid voluntarily even if the demand is illegal).  Notably, the voluntary payment rule does not apply where the payment was induced by fraud. *See Sheehy v. Williams*, 299 Va. 274, 278 (2020).

[10] Again, the mediation statute, Code § 8.01-581.26, does list fraud and duress as reasons to invalidate a mediation.  But no express waiver of sovereign immunity by the Commonwealth appears in that statute.

expectations of the other party regarding the fruits of the contract. *Restatement (Second) of Contracts* § 205 (1981).[11]

Thus, we find various cases dealing with whether a contracting party has *performed* existing contract terms fairly or dishonestly. For example, in *Charles E. Brauer Co. v. NationsBank of Va., N.A.*, 251 Va. 28 (1996), the Supreme Court of Virginia held that, where a defendant bank had a right either to foreclose on encumbered inventory or to reduce its claim to a judgment, its decision to reduce its claim to a judgment—which was an exercise of an explicit contractual right—was appropriate even though it was harsh to the plaintiff. *Id.* at 35 (when "parties to a contract create valid and binding rights, one party does not breach the . . . obligation of good faith by exercising such rights"). *See also Mahoney v. NationsBank of Va., N.A.*, 249 Va. 216, 219 (1995) (bank did not violate covenant of good faith by refusing to release collateral where a developer failed to meet the terms for the release).[12]

By contrast, in *Virginia Vermiculite*, a family contracted with a mining company for the sale of mining rights in their land. 156 F.3d at 557. The company had discretion in how much mining would occur. *Id.* at 538. However, the Fourth Circuit found the company's decision to donate the land to a trust to thwart a competitor—thereby foreclosing future mining—was a breach of the covenant toward the family. *Id.* at 542. *See also Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009) (finding violation of covenant based on failure to tell client his medical

---

[11] The Supreme Court has made clear that a breach of the implied covenant does not give rise to an independent stand alone action or tort. The duty, instead, imposes an obligation of good faith into the performance of a contract. *Charles E. Brauer Co. v. NationsBank of Va., N.A.*, 251 Va. 28, 33 (1996).

[12] The Supreme Court has observed that "when parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights." *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 254 Va. 379, 385 (1997). In other words, a claimant's notion of "good faith" cannot write an express term out of the agreement even if it proves to be harsh or detrimental.

condition would preclude his participation in space flights until after he had made multiple non-refundable payments under the contract); *Stoney Glen v. S. Bank and Tr. Co.*, 944 F. Supp. 2d 460 (E.D. Va. 2013) (analogizing *Virginia Vermiculite* to find the covenant could be breached when a bank had discretion as to its contract performance but acted arbitrarily in exercising that discretion).

These cases, and *North Star* relied upon by Montalla, show that if bad faith occurs in the *performance* of a contract, the covenant can be triggered. However, Montalla has failed to provide case law suggesting that the covenant operates in the context of a negotiation between sophisticated entities. *See Lynnwood Tech Holdings LLC v. NR Int. LLC*, No. 2015-15954 (Fairfax County 2017) ("The duty does not apply to the negotiation of a contract. Bad faith in negotiation of a contract is not within the scope of the duty of food faith and fair dealing . . . ."); *see also Wallace v. Nat'l Bank of Com.*, 938 S.W.2d 684, 687 (Tenn. 1996) ("The common law duty of good faith in the performance of a contract does not apply to the formation of a contract."); *Husman, Inc. v. Triton Coal Co.*, 809 P.2d 796, 801-02 (Wyo. 1991) (declining to consider an excavating company's implied covenant claim against a mining company because the alleged bad faith was the company's misrepresentations about soil conditions during the contract's negotiation—and stating the proper claim was one for "fraud or negligent misrepresentation"); *URS Group, Inc. v. Tetra Tech FW, Inc.*, 181 P.3d 380, 391 (Col. App. 2008) (The covenant "does not deal with good faith in the formation of a contract. Bad faith in negotiation [is] not within the scope" of *Restatement (Second) of Contracts* § 205.).[13]

---

[13] Montalla also attempts to unravel the mediation by claiming that the settlement was actually intended as a "modification" of the underlying contracts and, thus, Montalla's challenge involves the duty of good faith and fair dealing with respect to a modified, ongoing contract. The circuit court correctly rebuffed any suggestion that this settlement agreement was meant to be a modification. "When the terms in a contract are clear and unambiguous, the contact is construed according to its plain meaning." *Orthopaedic & Spine Ctr. v. Muller Martini Mfg. Corp.*, 61 Va. App. 482, 490 (2013). "A modification of a contract must be shown by clear, unequivocal and

- 18 -

* * *

In short, the Commonwealth and its agencies are entitled to the protection of sovereign immunity from Montalla's effort to equitably void the settlement agreement. To the extent Montalla might have pursued a claim of breach of the duty of good faith and fair dealing on the underlying contracts, NXL settled and released these claims. Thus, appellant cannot proceed on any claims for damages based on the original contracts. *See McKinley Chiropractic*, 294 Va. at 139 (assignee foreclosed from pursuing released claims).[14] Montalla similarly has failed to state claims that can void the mediation under the covenant of good faith and fair dealing—or under Code § 8.01-581.26. The circuit court correctly dismissed all the possible theories of recovery advanced in Count III.

### II. The Circuit Court Correctly Rejected Montalla's Economic Duress Claim and Montalla's Allegations Regarding Breach of the Underlying Contracts and Unconstitutional Takings are Barred

Count IV of Montalla's complaint addresses material breach of the underlying contracts between appellant and VDOT. Count IV, Montalla argues, includes the following: "(i) the failure to allow appellant to bill for reimbursable costs at established overhead rates agreed to in the contract, (ii) the unilateral, punitive and improper reduction of the rates to 0%, and (iii) the failure to provide Appellant with full reimbursement."

Count V of Montalla's complaint, the unconstitutional regulatory taking claim, is similarly based on the breach of the underlying 2014 contracts—VDOT's failure to pay amounts owed—

---

convincing evidence, direct or implied." *Id. at* 493. In the record, there is nothing in the settlement agreement and release to signify a contract modification. Indeed, the agreement says that it is a "Settlement Agreement and Release." Nowhere does the document purport to be a modification; similarly, the document does not point to another contract which it purported to modify. Finally, it is subject to the approval of the Governor of the Commonwealth, which a standard modification would not require pursuant to Code § 2.2-514. Montalla's claim that the settlement was intended as a contract modification cannot revive the released claims.

[14] Montalla's economic duress argument is discussed in Section II, *infra*.

coupled with economic duress. Thus, Montalla argues, these "contract" claims cannot be barred by VDOT's plea in bar of sovereign immunity. Moreover, Montalla asserts that the circuit court's letter on September 14, 2021 did not specifically address Counts IV and V, or provide legal grounds for dismissal other than stating they "'must be dismissed' based on VDOT's Plea in Bar of Sovereign Immunity." Montalla argues that neither Count IV nor V were affected by the ruling on VDOT's plea in bar and should have survived.

Again, appellant's predecessor in interest, NXL, expressly consented in the settlement agreement to release VDOT from all pecuniary claims under or related to the original contracts and the parties' dispute over FAR reimbursement rates. According to the Commonwealth's plea of accord and satisfaction,

> [o]n January 11, 2018, when the Settlement Agreement was executed, NXL and the Commonwealth agreed to completely resolve and settle their disputes and mutually release their claims against one another in exchange for NXL's payment of $4,000,000 to VDOT. This language, and the Settlement Agreement generally, have remained in full force and effect. This executed Settlement Agreement constituted an accord between NXL and VDOT.

Montalla does not contest the existence of the mediated settlement and release, but asserts that economic duress can operate to overturn a settlement agreement. The circuit court, in dismissing Montalla's claims, necessarily rejected this additional attack on the release. We find that Counts IV and V were properly dismissed.[15]

Settlements have long been favored under Virginia law. *See Chesapeake & Ohio Ry. Co. v. Mosby*, 93 Va. 93, 100 (1896) ("The law favors the compromise and settlement of disputed

---

[15] Sovereign immunity is a defense against suit, not an exemption from particular legal doctrines. Where the Commonwealth, itself, has raised an accord and satisfaction plea in bar, Montalla may challenge the plea by arguing the agreement was the product of economic duress. In this case, for the reasons that follow, we find that Montalla has failed to make out a viable claim for economic duress.

- 20 -

claims. It is to the interest of all that there should be an end of litigation; and a settlement deliberately sought, as this was by the plaintiff, ought not to be set aside except upon the most satisfactory evidence."); *Cary v. Harris*, 120 Va. 252, 257 (1917) ("Compromise agreements are favored."). By contrast, as this Court has noted:

> In Virginia, duress is not readily accepted as an excuse. *Seward v. American Hardware Co.*, 161 Va. 610, 639 (1933). The party alleging fraud is required to prove it by clear and convincing evidence, *Cary v. Harris,* 120 Va. 252, 255 (1917), and duress is a species of fraud to which this rule applies. *Ford v. Engleman*, 118 Va. 89, 96 (1915).

*Norfolk Div. of Social Services v. Unknown Father*, 2 Va. App. 420, 434 (1986).

The gist of a duress claim is that the victim had no free will in the disputed agreement. *See Ford*, 118 Va. at 95 ("[A] contract entered into under duress can be avoided . . . because there is no real consent."). Even if all of Montalla's pleadings are taken as true, this settlement was reached by sophisticated parties, represented by counsel, at a formal mediation which occurred many months after the dispute initially arose. *See Freedlander, Inc. The Mortgage People v. NCNB National Bank of North Carolina*, 706 F. Supp. 1211, 1217 (E.D. Va. 1988) (immediacy is a hallmark of duress). These circumstances suggest a business decision to resolve a financial hardship rather than a coercion so forceful as to render NXL's consent involuntary or nonexistent. *Id.* Nonetheless, to properly analyze a "business decision," a fact-finder generally would not read intent and consent in a vacuum.[16]

However, to establish a duress claim under Virginia law, the party asserting coercion must promptly repudiate the agreement. *See Gloth v. Gloth*, 154 Va. 511, 552 (1930) ("[I]t was

---

[16] Even taking the facts in light most favorable to Montalla as we must at this stage of pleading, a claim for duress is still properly demurrable if the claim for economic duress is otherwise insufficient. *See Gloth v. Gloth*, 154 Va. 511, 552-54 (1930) (holding a duress claim was properly demurred despite accepting the allegation that "the will of the appellant was overcome by the threats of the appellee" when the appellant did not timely repudiate the contract).

incumbent upon the appellant to have proceeded promptly upon the removal of the duress, if such existed, to repudiate the contract."); *see also Link Associates v. Jefferson Standard*, 233 Va. 479, 484 (1982) (A party intending to repudiate a contract based on fraud "must act within a reasonable time and with great punctuality upon learning of the wrong."). Here, at no point did NXL repudiate or disavow the accord. Rather than repudiating the settlement, NXL ultimately bargained to pay the negotiated sum early—and at a discount. Under *Gloth*, this failure of repudiation defeats a claim of duress. 154 Va. at 552.

Montalla's claims in Counts IV and V ultimately result in a reprise of attempts to rescind the settlement agreement and then collect on the released claims. Montalla simply fails to provide a basis upon which any recovery on the underlying contract claims can remain viable in light of sovereign immunity and the release and settlement entered between NXL and VDOT.

### III. The Circuit Court has the Discretion to Change its Mind, and the Circuit Court Did Not Abuse its Discretion in Denying Montalla's Motion to Reconsider

We review a circuit court's judgment sustaining a demurrer de novo. *Coutlakis v. CSX Transp., Inc.*, 293 Va. 212, 216 (2017) (quoting *Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 356-57 (2010)). When reviewing such a judgment, we "accept as true all factual allegations expressly pleaded in the complaint and interpret those allegations in the light most favorable to the plaintiff." *Coward v. Wellmont Health Sys.*, 295 Va. 351, 358 (2018). Furthermore, we draw any reasonable inferences arising from the express factual allegations of the complaint in the plaintiff's favor. *Id.*; *Coutlakis*, 293 Va. at 216.

Appellant points out a series of purportedly wrongful acts by VDOT which created financial distress including the fact that NXL was told VDOT would consider terminating all contracts with the company if it did not comply with the 0% rate, and later changing the rate to 75%, which was still far below what was agreed upon in the initial contract. Furthermore, appellant states that the

wrongful acts continued when VDOT engaged in activity such as advocating in favor of ACO's incorrect interpretation of FAR during the mediation.

Appellant is understandably upset by the treatment to which it alleges NXL was subjected. Appellant also notes that the circuit court initially agreed with its economic duress claim. The court, however, promptly reversed itself the day after its initial oral ruling. Montalla challenges this reversal.[17] However, a court maintains the prerogative to reconsider a ruling it has made until it loses jurisdiction over the case. *See Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 403 (1985) (highlighting the trial court's broad discretion in reconsidering its own ruling); *see also* Rule 4:15; Rule 1:1. For the reasons set forth above, we believe the circuit court correctly resolved the issue. That is not to say we approve of the Commonwealth's handling of the FAR dispute. Nonetheless, based on the plea in bar of sovereign immunity and NXL's settlement and release of the underlying contract claims, Montalla remains without relief. In short, the circuit court was empowered to reconsider its initial ruling—and, in our judgment, correctly resolved it.

Along the same lines, Montalla challenges the circuit court's refusal to entertain its motion to reconsider. "Motions . . . to reconsider a prior ruling involve matters wholly in the discretion of the trial court." *Thomas v. Commonwealth*, 62 Va. App. 104, 109 (2013). Thus, "[w]e review a trial court's denial of a motion to reconsider for an abuse of discretion." *Winston v. Commonwealth*, 268 Va. 564, 620 (2004). "When we say that a circuit court has discretion, we mean that 'the [circuit] court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" *Galiotos v. Galiotos*, 300 Va. 1, 10 (2021) (alteration in original) (quoting *Landrum v. Chippenham and Johnston-Willis Hosps., Inc.*,

_____

[17] With respect to the circuit court's initial oral ruling, the Commonwealth contends that Montalla seeks an advisory opinion regarding the merits of an order that was never entered. Advisory opinions represent an unnecessary exercise of judicial power, "one in which the Virginia judiciary traditionally declines to participate." *Va. Dept. of State Police v. Elliott*, 48 Va. App. 551, 553 (2006).

282 Va. 346, 352 (2011)).  "[O]nly when reasonable jurists could not differ can we say an abuse of discretion has occurred."  *Id.* at 11 (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)).

Appellant points out that during oral argument, the circuit court initially agreed with appellant's position on "economic duress" and did not later give a full explanation of why it dismissed Counts IV or V.  Due to this lack of explanation, appellant argues that the court erred by failing to grant appellant's motion for reconsideration.  Here, however, it is clear on the record that the circuit court considered appellant's briefings and argument relating to economic duress in conjunction with the hearing conducted on the issue.  In fact, as Montalla acknowledges, the circuit court was initially swayed by the economic duress claim.

Notably, there is no suggestion that appellant sought to present new evidence at any rehearing.  *See N. Va. Real Estate, Inc. v. Martins*, 283 Va. 86, 118-19 (2012) (holding a trial court did not err in denying a motion to reconsider where the moving party had "not raised any issues not already considered in th[e] matter"); *see also Amos v. Commonwealth*, 61 Va. App. 730, 741 (2013) (en banc) ("[L]itigants [have] no right to present oral argument on a motion to reconsider.  Instead, such arguments are presented at the discretion of the trial court.").  Essentially, appellant contends that the trial court did not give a satisfactory explanation for choosing to dismiss Counts IV and V.  While the ruling was not long on explanation, the circuit court reached the correct determination that appellant's efforts to void the settlement agreement or collect damages on the settled 2014 contracts are foreclosed by sovereign immunity and the existence of a binding release.  Where appellant had a full opportunity to present its arguments, the circuit court did not abuse its discretion in denying the motion to reconsider.  *Martins*, 283 Va. at 118-19.|

IV.  The Circuit Court Did Not Abuse its Discretion in Denying Leave to Amend

"On appeal, review of the trial court's decision to grant or deny a motion to amend is limited to the question whether the trial [court] abused its discretion." *Lucas v. Woody*, 287 Va. 354, 363 (2014) (citation omitted).

Rule 1:8 states that "[l]eave to amend shall be liberally granted in furtherance of the ends of justice."  Furthermore, amendments are permitted after a ruling on a plea in bar.  Appellant argues that in this case, leave to amend was appropriate to clarify and expand upon the scope of Count III, "which would have more clearly demonstrated to the court that the claim is clearly based in contract . . . and thus, not subject to sovereign immunity."  Appellant also states that appellees would not have been harmed by the amendment.

In *Roop v. Whitt*, 289 Va. 274 (2015), the record showed that Roop made an oral motion for leave to amend his amended complaint; however, there were no disclosures or description regarding how the amendment would alter the pleading which the circuit court had ruled upon.  Therefore, the Court in *Roop* could not review the circuit court's decision to deny the motion.  *Id.* at 280-81.  In the present case, the same principles apply.  Montalla gave no indication it planned to assert new arguments to overcome its sovereign immunity hurdle.[18]

Appellant never specified what factual allegations it would have made to show it is entitled to pursue claims for breach of contract, particularly where the settlement agreement remained in place and the underlying claims were released.  *See Hechler Chevrolet*, 230 Va. at 403 ("The trial court, however, retains discretion to deny a motion for leave to amend when it is apparent that such an amendment would accomplish nothing more than provide opportunity for reargument of the

---

[18] Indeed, Rule 1:8, itself, states: "[u]nless otherwise provided by order of the court in a particular case, any written motion for leave to file an amended pleading must be accompanied by a properly executed proposed amended pleading, in a form suitable for filing."  That did not happen here.

question already decided."). Accordingly, the circuit court did not abuse its discretion in denying leave to amend the complaint under these circumstances. The court retained the discretion to decline to simply readjudicate the complex issues it had previously decided. *See id.*

## CONCLUSION

There is a well-worn adage that "bad facts" can lead to unsettling outcomes. The outcome in this case, under the facts pled, is not a triumph of equitable principles. However, the dispute was properly resolved below by the circuit court. Montalla's Count I to "null and void" the settlement agreement, essentially via rescission, could not survive VDOT's sovereign immunity defense. Count II's claim that the Commonwealth waived sovereign immunity as to mediations under Code § 8.01-581.26 is defeated by the absence of any explicit waiver of the doctrine in the statute. Montalla's covenant of good faith and fair dealing claims fell because the underlying contracts were settled and released. Similarly, the good faith claims as to negotiation tactics in the mediation do not state a claim under *Restatement (Second) of Contracts* § 205. The final counts alleging breach of the underlying contracts and an "improper taking" fall prey to the same accord and satisfaction defenses as the underlying contracts where NXL fully settled and released these claims. The economic duress attack on the settlement agreement similarly fails because that mediated settlement was not repudiated by NXL.

Montalla is understandably chagrined that the circuit court reversed its initial, oral ruling that a portion of its claim survived the Commonwealth's defenses. The circuit court, however, had discretion to reconsider the matter. Similarly, it did not abuse its discretion in declining to entertain Montalla's motion to reconsider. Nor did it abuse its discretion in denying Montalla's request for leave to amend its pleading. We affirm the ruling of the circuit court.

*Affirmed.*